[No. S099665. June 27, 2002.]

DANIEL BECK, Plaintiff, Cross-defendant, and Respondent, v.
RONALD H. WECHT et al., Defendants;
AMERICAN EQUITY INSURANCE COMPANY, Intervener and
Appellant.

DANIEL BECK, Plaintiff and Appellant, v.
RONALD H. WECHT et al., Defendants and Respondents.

## COUNSEL

Drath, Clifford, Murphy, Wennerholm & Hagen, John M. Drath and Raymond Z. Bacerdo for Intervener and Appellant American Equity Insurance Company and for Defendants and Respondents Ronald H. Wecht et al.

M. Armon Cooper; Carlson, Calladine & Peterson, Guy D. Calladine and Henry Chun for Plaintiff, Cross-defendant and Respondent and for Plaintiff and Appellant Daniel Beck.

## OPINION

**BROWN, J.**—The question presented by this case is whether one cocounsel may sue another for *breach of fiduciary duty* on the theory that the latter's malpractice in handling their mutual client's case reduced or eliminated the fees the former expected to realize from the case. There is a split of authority on this question. *Pollack v. Lytle* (1981) 120 Cal.App.3d 931 [175 Cal.Rptr. 81] (*Pollack*) recognized such a fiduciary duty, but *Joseph A. Saunders, P.C. v. Weissburg & Aronson* (1999) 74 Cal.App.4th 869 [87 Cal.Rptr.2d 405] (*Saunders*) rejected it as potentially inconsistent with counsel's overriding

duty to the client. ■ Like the Court of Appeal in the present case, we agree with *Saunders* that it would be contrary to public policy to countenance actions based on the theory that cocounsel have a fiduciary duty to protect one another's prospective interests in a contingency fee.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1992 Michael and Robert Stephens hired Attorney Daniel Beck to represent them in a lawsuit against General Motors, to recover for serious injuries the Stephenses sustained when the pickup truck they were riding in rolled over and burst into flames. With the Stephenses' consent, Beck associated Texas Attorney L.L. McBee into the case, because McBee had experience prosecuting what were known as "side-saddle" gas tank cases against General Motors. Again with agreement of the clients, McBee and Beck associated Attorney Ronald H. Wecht and his law firm, Walkup, Melodia, Kelly & Escheverria (collectively Wecht), as local trial counsel. By separate written agreements, it was agreed that McBee would advance all costs, and Beck's contingent fee would be split 53 percent for McBee and 47 percent for Beck. Wecht was to receive 10 percent of the contingent fee, to be shared pro rata from the shares of McBee and Beck.

Despite attempts at pretrial settlement, no settlement was reached, and the case proceeded to jury trial in April 1997. During the course of the trial, General Motors offered to settle the case for $6 million. On the night before closing arguments, the Stephenses met with Wecht and McBee and told them they wanted to settle the case. McBee was to contact General Motors and discuss settlement, but never did so. In late June of 1997, the jury returned a defense verdict.

In the months leading up to trial, the relationship between Beck and the other attorneys, particularly McBee, eroded. McBee accused Beck of undermining settlement negotiations, and Beck accused McBee of alienating him from his clients. By the time of trial Beck was an observer, not a participant.

After trial, the Stephenses brought a legal malpractice action against McBee and Wecht for failing to carry out their settlement instructions.[2] In addition, they claimed that Wecht was vicariously liable for McBee's misconduct based upon joint venture principles. The Stephenses brought no

---

[1]We adopt the Court of Appeal's statement of the factual and procedural background as part I of our opinion. No party petitioned for rehearing to suggest that the Court of Appeal omitted or misstated any material fact. (Cal. Rules of Court, rule 29(b)(2).) Brackets enclosing material (other than parallel citations) denote insertions or additions by this court.

[2][Beck did not represent the Stephenses in the malpractice action against McBee and Wecht.]

action against Beck. McBee settled with the Stephenses for a confidential sum. As a condition of settlement, Beck was paid $224,000 out of this sum, in exchange for a release of his claims against McBee. Thereafter, Wecht admitted that McBee was negligent in his handling of the Stephenses' case. Although Wecht denied that a joint venture existed, his malpractice insurance carrier, American Equity Insurance Company (American Equity), paid $1.4 million to settle the Stephenses' claims against Wecht.

In December 1998, Beck filed a complaint against Wecht for breach of fiduciary duty to recover the fee he would have received had McBee and Wecht followed the Stephenses' instructions and settled the case against General Motors for $6 million. In July 1999, Wecht filed a cross-complaint for indemnity, breach of fiduciary duty, comparative fault and breach of contract. Thereafter, American Equity intervened and sued Beck in subrogation, seeking contribution from Beck toward the settlement amount it paid on Wecht's behalf. Each party successfully moved for summary judgment of the other's claims. Both parties timely appealed from the orders granting summary judgment, and [the Court of Appeal] consolidated the appeals for oral argument and decision.

[In Beck's appeal (case No. A092636), the Court of Appeal affirmed the trial court's entry of summary judgment in favor of Wecht. In American Equity's appeal (case No. A092221), the Court of Appeal affirmed the trial court's entry of judgment in favor of Beck. We granted Beck's petition for review; American Equity did not petition for review.]

## II. Discussion

As was mentioned, there is a split of authority with regard to the question whether one cocounsel may sue another for breach of fiduciary duty on the theory that the latter's malpractice in handling their mutual client's case reduced or eliminated the fees the former expected to realize from the case. *Pollack, supra,* 120 Cal.App.3d 931, recognized such a fiduciary duty, while *Saunders, supra,* 74 Cal.App.4th 869, rejected it as potentially inconsistent with counsel's overriding duty to the client.

### A. *Pollack: Recognizing Fiduciary Duty Among Cocounsel*

In *Pollack, supra,* 120 Cal.App.3d 931, Pollack sued Lytle for breach of fiduciary duty, fraud, breach of contract, legal malpractice, and declaratory relief arising out of their joint representation of a client in a medical malpractice action. According to the allegations of the complaint, Pollack filed the medical malpractice action, but, because of a malpractice crisis,

found it extremely difficult to secure a neurosurgeon to testify on the client's behalf. Lytle initiated discussions with Pollack in which he made the following false representations: that he was a close personal friend of a board-certified neurosurgeon who would be willing to testify on behalf of the client, but who would only do so if Lytle served as trial counsel; that he was employed by a law firm specializing in medical malpractice cases; and that he was experienced in the preparation and trial of such cases. On the basis of these false representations, Pollack associated Lytle as trial counsel and agreed that Lytle would receive one-third of Pollack's 50 percent contingency fee. Lytle thereafter falsely represented to Pollack that in his deposition the neurosurgeon had testified that violations of standard professional practice by the treating physician and the hospital were the proximate cause of the client's quadriplegia, whereas, in fact, the issue of proximate cause had not even been addressed in the neurosurgeon's testimony. On the basis of this misrepresentation, among many others, Pollack advised the client to reject a settlement offer. The jury returned a verdict in favor of the malpractice defendants, and Lytle then induced the client to file a legal malpractice action against Pollack. (*Pollack*, at pp. 936-939.)

The Court of Appeal concluded, over a strongly worded dissent, that Lytle's relationship to Pollack as associate counsel was governed by agency principles, and that Lytle had breached his fiduciary duty to Pollack, entitling Pollack to indemnification. (*Pollack, supra,* 120 Cal.App.3d at pp. 940-943.) Although it acknowledged "the growing body of law which holds, as a matter of public policy, that a successor attorney owes no duty to his predecessor [citations]" (*id.* at p. 942), the majority found the policy rationale of those cases inapplicable to cases involving associate or concurrent counsel. "The roles of successor and associate attorneys are decidedly different. In the fulfillment of his duty of undivided loyalty to the client, a successor attorney must view the client's situation as of the moment when he is engaged. Hence public policy requires that he not be subjected to any possible conflict of interest which may deter him from determining the best interests of the client by the possibility that he may be held liable for his acts by his predecessor. [Citation.] In contrast, an associate attorney acting as the agent of the principal attorney replaces no one, but acts at the behest of his principal. [¶] Admittedly, he remains bound to act in the best interests of the client, but this creates no unavoidable conflict. Should he find that the principal attorney's actions to date pose a potential danger to the client's best interests, the agent-associate is dutybound to make the fullest disclosure of these material facts to the principal attorney. Since the principal attorney and the associate attorney each owes the same duty of loyalty to the client, the disclosure of information which reveals a potential danger to the client's interests will normally prompt the principal attorney to act in protection of

those interests. However, should the principal attorney choose to ignore the client's interests, the agent-associate remains free to terminate the agency relationship and withdraw as associate counsel. Furthermore, the associate attorney's duty to exercise reasonable professional care, skill and diligence on behalf of the client is precisely equivalent to the duty he owes his principal in dealing with the subject matter of the agency. Accordingly, public policy considerations do not mandate that an associate attorney remain free from liability for a breach of duty owed to his principal. To the contrary, whether associate counsel is brought in from outside the principal attorney's office or is the junior associate in a firm of attorneys, the problems inherent in allowing an agent-associate to act in conflict with or contradiction of the principal attorney are manifest. Holding that an associate attorney owes no duty to anyone but the client would create the potential for a battle of wills over promotion of the client's interests, a situation which could well rebound to the client's detriment, for the determination of the client's best interests is at best a subjective value judgment upon which reasonable minds could differ. Moreover, in view of the principal attorney's liability for the acts of subordinate counsel under the doctrine of respondeat superior, it would be manifestly unfair to relieve an agent-associate of accountability to his principal." (*Id.* at pp. 942-943.)

Justice Johnson dissented from the majority on the ground that no rational distinction could be made between the duties running to successor attorneys and those running to cocounsel. "There is a substantial body of law concerning the liability of attorneys who sue each other in connection with common clients. A fiduciary relationship has not heretofore been recognized, and, regardless of legal theory asserted, there has emerged a recurring theme; a client's right to the undivided loyalty of his or her attorneys must be protected, even when the result of such rule is the denial of an attorney's cause of action against another attorney." (*Pollack, supra,* 120 Cal.App.3d 931, 945 (dis. opn. of Johnson, J.).) "Regardless of context, the underlying rationale . . . , that the possibility of a cause of action for indemnity in legal malpractice cases, whether sought against a predecessor or successor attorney, would create such potentially burdensome conflicts of interest for an attorney representing a client, public policy dictates that such a cause of action should be barred." (*Id.* at p. 948.) Recognizing a fiduciary duty between cocounsel would increase the exposure of attorneys to liability, Justice Johnson concluded, "placing them in an untenable position of divided loyalties to their clients and associated counsel." (*Id.* at p. 949.)

B. *Saunders: Rejecting Fiduciary Duty Among Cocounsel*

In *Saunders, supra,* 74 Cal.App.4th 869, the plaintiff, an attorney, and the defendant, another law firm, had jointly represented a group of hospitals in

the underlying action against the Medicare program. The plaintiff attorney alleged various causes of action based on the premise that the defendant law firm had breached certain duties owed to him by influencing the hospitals to accept a settlement that was, because of their differing fee agreements with the several hospitals, more favorable to the defendant than it was to the plaintiff. Following the grant of summary judgment in favor of the defendant, the plaintiff appealed. (*Id.* at pp. 870-871.) For guidance in resolving the tension between the duties that cocounsel unquestionably owe their mutual client and the duties they assertedly owe one another, the *Saunders* court looked to two cases—*Pollack, supra,* 120 Cal.App.3d 931, and *Mason v. Levy & Van Bourg* (1978) 77 Cal.App.3d 60 [143 Cal.Rptr. 389] (*Mason*).

In *Mason*, the plaintiff attorney alleged that he had transferred two cases to the defendant attorneys on the written understanding he would share in the contingency fee the client had agreed to pay; that the defendants failed to exercise their best efforts to either settle the cases or bring them to trial prior to the running of the statute of limitations; and that as a result of the defendants' misconduct, the plaintiff lost his share of the fee the cases should have yielded. (*Mason, supra,* 77 Cal.App.3d at pp. 63-64.) The *Mason* court rejected the assertion that the defendants owed the plaintiff a duty. "It is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his clients. [Citation.] This loyalty should not be diluted by a duty owed to some other person, such as an earlier attorney. While, as a practical matter, both the client and the former attorney stand to benefit from any recovery in the client's action, their interests are not identical. For example, in the cases transferred from plaintiff to defendants there was a cross-action against the client, Mr. Lawson. Depending on the circumstances, the client's interests may best be served by withdrawing from the dispute and allowing the statute of limitations to run. On the other hand, the former attorney, not exposed to any potential liability on the cross-action, may prefer to gamble for any recovery by pursuing the matter to settlement or judgment. It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him an obligation to take into account the interests of predecessor attorneys." (*Id.* at pp. 66-67.)

The *Mason* court noted the adverse consequences that would flow from the recognition of the asserted duty. "If the law were to recognize duties, such as are suggested here, between successive attorneys representing the same client, a multitude of litigation could be spawned with an attendant adverse impact on attorney-client relationships. Every lawyer could blame his problems in a lawsuit on his predecessors. Every lawyer referring a case to another lawyer would be in a position to claim that the negligence of the

second lawyer caused a meritorious claim to be lost or settled for an insufficient amount. Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome. Considerations of public policy support the conclusion that an attorney's duty of undivided loyalty to his client should not be diluted by imposing upon him obligations to the client's former attorney, or at least obligations greater than the client himself owed to the former attorney." (*Mason*, *supra*, 77 Cal.App.3d at p. 67, fn. omitted.)

As we discussed above, the majority in *Pollack* found the policy rationale of *Mason* inapplicable to the situation of associate counsel. "The roles of successor and associate attorneys are decidedly different. In the fulfillment of his duty of undivided loyalty to the client, a successor attorney must view the client's situation as of the moment when he is engaged. Hence public policy requires that he not be subjected to any possible conflict of interest which may deter him from determining the best interests of the client by the possibility that he may be held liable for his acts by his predecessor. [Citation.] In contrast, an associate attorney acting as the agent of the principal attorney replaces no one, but acts at the behest of his principal." (*Pollack*, *supra*, 120 Cal.App.3d at p. 942.)

The *Saunders* court was not convinced by the *Pollack* majority. "With all due respect . . . , we do not find this analysis persuasive. The duty of both the associate and the successor attorney is the same: to serve the best interests of the client." (*Saunders*, *supra*, 74 Cal.App.4th at p. 873.) "[R]ecognizing a duty on the part of cocounsel as urged by Saunders would be inconsistent with counsel's duty to exercise independent judgment on behalf of the client. Saunders argues that here, Weissburg's duty to its clients was precisely the same as its duty to cocounsel, so that Weissburg was faced with no conflict. Yet the record indicates that the clients were satisfied with Weissburg's representation, while Saunders was not. That surely indicates that recognition of a duty on the part of Weissburg to its cocounsel potentially conflicts with Weissburg's duty to its clients of undivided loyalty and total devotion to their interests. Indeed, the *Mason* court envisioned just this situation in observing that 'Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome.' (*Mason v. Levy & Van Bourg*, *supra*, 77 Cal.App.3d at p. 67.)" (*Saunders*, at p. 874.)

C.  *Public Policy Concerns: Avoiding Conflicts of Interests and Protecting the Confidentiality of Attorney-client Communications*

Recognizing a fiduciary relationship among cocounsel, the *Pollack* majority concluded, "creates no unavoidable conflict" between the duty cocounsel

would owe one another and the duty cocounsel would owe their mutual client. (*Pollack, supra*, 120 Cal.App.3d at p. 942.) "[S]hould the principal attorney choose to ignore the client's interests," the *Pollack* majority argued, "the agent-associate remains free to terminate the agency relationship and withdraw as associate counsel." (*Ibid.*) However, as the dissent pointed out, withdrawal might well conflict with the duties an attorney owes his client, including those imposed by former rule 2-111, now rule 3-700, of the Rules of Professional Conduct of the State Bar of California, which prohibit an attorney from withdrawing as counsel without consent of the court and where the client would be prejudiced. (*Pollack, supra*, 120 Cal.App.3d 931, 948-949 (dis. opn. of Johnson, J.).) Rule 3-700(C)(3) allows withdrawal where "inability to work with co-counsel indicates that the best interests of the client likely will be served by withdrawal." If the associate attorney really believes the principal attorney is not acting in the client's best interests, it is difficult to understand how the associate attorney could conclude the client's best interests would be served by his withdrawal.

*Saunders* is an example of the sort of case in which the potential for conflict is palpable. In *Saunders*, while the hospitals, the mutual clients, were satisfied with the settlement of their lawsuit against the Medicare program, the plaintiff attorney complained that his cocounsel had structured the settlement in a manner that maximized his own fees by favoring hospitals not subject to the contingency fee agreement between the cocounsel. (*Saunders, supra*, 74 Cal.App.4th at pp. 870-871, 874.) Structuring the settlement differently might have better satisfied the aggrieved cocounsel, but to the detriment of the clients. The most cynical views of the legal profession would be confirmed by recognition of a fiduciary duty on the part of cocounsel to maximize one another's fees.

Like the *Saunders* court, the Court of Appeal in this case found *Mason* more persuasive than *Pollack*. "We, too, are convinced that the policy reasons expressed in *Mason* are valid in the cocounsel context presented here. As happened in *Saunders*, cocounsel Beck's dissatisfaction with the handling of the Stephenses' case by Wecht and McBee points up the myriad conflicts that may arise among attorneys representing the same clients, and the resulting inability to consider only the clients' best interests. To avoid any detriment to the jointly represented client, it is imperative that no collateral duties arise to interfere with the duty of 'undivided loyalty and total devotion' owed to the client. (*Saunders, supra*, 74 Cal.App.4th at p. 874[, quoting *Mason, supra*, 77 Cal.App.3d at p. 67].) Thus, the trial court correctly granted summary judgment for Wecht, because, as a matter of law, he owed no fiduciary duty to Beck."

Beck objects there was, in fact, no conflict in this case between the duty that his cocounsel Wecht assertedly owed him and the duty Wecht unquestionably owed their mutual clients, the Stephenses—Wecht owed both of

them a duty to follow the Stephenses' settlement instructions. However, in fact, irreconcilable conflicts among the three cocounsel arose much earlier, and by the time the underlying case was tried, during which the settlement offer was made, Beck had become "an observer, not a participant." Significantly, McBee accused Beck himself of *undermining settlement negotiations*, while Beck accused McBee of alienating him from his clients.

With regard to the concern that the attorney-client privilege might be jeopardized, Beck argues that the attorney-client privilege was not jeopardized in this case because the clients, the Stephenses, waived the privilege by filing malpractice actions against Wecht and McBee, by testifying about their communications with Wecht and McBee in their depositions, and by failing to object when Wecht testified about his communications with them in his deposition. Wecht concedes "it *happened* in this case that the clients waived the [attorney-client] privilege, and that the work product privilege was not a factor." However, Wecht points out, it will not always be the case that the client will waive the privilege by filing a malpractice suit. Indeed, the clients in *Saunders* were satisfied with the representation afforded them by the attorney sued by his cocounsel for breach of fiduciary duty. (*Saunders, supra,* 74 CalApp.3d at p. 874.)

Beck's effort to distinguish his case on the facts raises a fundamental question. Should this issue—whether cocounsel owe one another a fiduciary duty to conduct their joint representation in a manner that does not diminish or eliminate the fees each expects to collect—be decided on a case-by-case basis? We think not. The better approach, we conclude, is a bright-line rule refusing to recognize such a fiduciary duty. Accordingly, we disapprove *Pollack v. Lytle, supra,* 120 Cal.App.3d 931, insofar as it is inconsistent with the views expressed herein.

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.