JOURNAL ENTRY AND OPINION
{¶ 1} After a trial to the court, plaintiffs Charles Gruenspan and Charles Gruenspan Co., L.P.A. (since Gruenspan's brief refers to himself personally, we will continue that use), received a judgment of $125,000 on its claim for legal fees from a number of different defendants. The court granted summary judgment to several other defendants. In this appeal, Gruenspan complains that the court erred by (a) dismissing his complaint as to two defendants; (b) granting summary judgment to seven of the defendants; (c) making legally insufficient findings of fact and conclusions of law; and (d) calculating damages and interest. Several defendants filed a notice of cross-appeal, but dismissed the cross-appeal on the day of hearing.
 {¶ 2} Because the bulk of the assigned errors are procedural in nature, an abbreviated statement of the underlying facts will suffice. Gruenspan represented defendants Robert and Dolores Thompson and several of their companies (the parties have referred to them as the "Thompson defendants") in extended litigation involving two primary cases: the first against the Cuyahoga Metropolitan Housing Authority ("CMHA") and the second against two accounting firms in litigation relating to tax credits on an apartment complex. At some points in that relationship, defendant Alexander Jurczenko acted as co-counsel with Gruenspan. Gruenspan claimed that he had negotiated settlement numbers on behalf of the Thompsons, but they chose not to settle. On the eve of trial, the Thompsons discharged Gruenspan and asked Jurczenko to represent them. Jurczenko then allegedly settled the cases for the same dollar amount that Gruenspan had negotiated. Gruenspan believed that the settlements were reached with the agreement that he would not receive any fees from the settlements.
 {¶ 3} Gruenspan brought suit against the Thompson defendants, Jurczenko, CMHA, CMHA's legal counsel, and accountants who represented the parties whom the Thompsons sued, alleging claims ranging from breach of contract, fraudulent conveyance, malpractice, tortious interference with business relationship, breach of fiduciary duty, quantum meruit, conspiracy and intentional infliction of emotional distress. In short, Gruenspan believed that the defendants conspired among themselves to reap the benefits of settlement numbers that Gruenspan had negotiated.
 {¶ 4} The court granted summary judgment to a number of defendants and, on the eve of trial, Gruenspan filed a voluntary notice of dismissal without prejudice and sought to appeal the summary judgments. Because the court had not certified the summary judgments pursuant to Civ.R. 54(B), we dismissed the appeal on grounds that the voluntary dismissal disposed of the entire case, including the interlocutory summary judgments. SeeCharles Gruenspan Co., L.P.A. v. Robert Thompson (Oct. 12, 2000), Cuyahoga App. No. 77276.
 {¶ 5} Gruenspan refiled his complaint and the defendants again sought summary judgment. The court granted the motions as unopposed because Gruenspan failed to submit opposition in a timely manner. The case proceeded to trial against the remaining defendants and the court found in Gruenspan's favor, awarding him fees of $125,000. Gruenspan contests the summary judgments and is disappointed by the size of the damage award. Other facts will be developed as necessary within individual assignments of error.
 I {¶ 6} Gruenspan filed his complaint against Klaiman, Bush 
Associates (former accountants for the Thompson defendants and named defendants in the malpractice case captioned Dynes Corporation v.Seikel, Koly Co., Cuyahoga C.P. No. 222332) on October 18, 2000. Gruenspan perfected service on March 26, 2001. On April 18, 2001, the court dismissed Gruenspan's complaint for want of prosecution. Gruenspan argues that the court had no basis for finding that he failed to prosecute the matter.
 {¶ 7} Civ.R. 41(B)(1) states that "where the plaintiff fails to prosecute * * * the court, upon motion of a defendant or on its own motion may, after notice to the plaintiff's counsel, dismiss an action or a claim." The rule does not define what constitutes a failure to prosecute. The Staff Notes cite as examples of a failure to prosecute an appearance at trial by counsel who is completely unprepared or who fails to appear at all. Other examples of grounds for dismissal are violations of rules or court orders. At bottom, the rule appears intended to vindicate the authority of the court by punishing the dilatory party. The United States Court of Appeals for the Second Circuit has construed the analogous federal rule as showing a failure to prosecute "either in an action lying dormant with no significant activity to move it or in a pattern of dilatory tactics." Lyell Theatre Corp. v. Loews Corp. (C.A. 2, 1982), 682 F.2d 37, 42.
 {¶ 8} Under Civ.R. 4(E), Gruenspan had six months in which to perfect service on Klaiman. He did so just under that deadline. The court's dismissal, coming only three weeks later, was an obvious abuse of discretion, as the dismissal, in effect, punished Gruenspan for taking no action during that three week period.
 {¶ 9} Moreover, a Civ.R. 41(B)(1) dismissal for failure to prosecute requires advance notice of the court's intent to dismiss. SeeLogsdon v. Nichols (1995), 72 Ohio St.3d 124. The court did not give Gruenspan any notice of its intent to dismiss, so the dismissal was improper for that reason as well.
 {¶ 10} We are aware that Gruenspan had previously filed and dismissed an action against Klaiman, but that procedural fact has no bearing on the dismissal. A party has twelve months to perfect service, see Civ.R. 3(A), and a miminum of six months before the rules authorize the court to take any action. Once Gruenspan perfected service within that six month period, the court's basis for finding a want of prosecution disappeared. Klaiman argues that even if the court erred by dismissing the case against it, we can affirm for different reasons; namely, that Gruenspan's claims are barred by res judicata. The difficulty with this argument is that res judicata is an affirmative defense under Civ.R. 8(C), and a motion to dismiss is "generally not the proper method to raise the affirmative defense of res judicata." State exrel. SuperAmerica Group v. Licking Cty. Bd. of Elections,80 Ohio St.3d 182, 185, fn. 1, 1997-Ohio-347, citing Shaper v. Tracy
(1995), 73 Ohio St.3d 1211, 1212. This is because the record usually needs to be developed beyond the pleadings. There is nothing in the pleadings filed in this case that would substantiate Klaiman's res judicata affirmative defense. And even if we were to convert Klaiman's motion to dismiss into a motion for summary judgment, those arguments should be considered first by the court, not us. We therefore sustain the first assignment of error.
 II {¶ 11} The court granted summary judgments to defendants Jurczenko, CMHA, Kelly, McCann Livingstone (as well as individually-named lawyers O'Bryan and Summers), and Seikel and Seikel Co. as unopposed because Gruenspan failed to file any opposition within the allotted time for response.
 {¶ 12} Before addressing the individual arguments presented by Gruenspan, we must consider that the court granted the summary judgments as unopposed. Gruenspan makes no specific argument on appeal that the court erred in doing so, hence he has waived the right to argue his version of the facts on appeal. Of course, even when a motion for summary judgment is unopposed, the motion and supporting evidence must show the absence of any material fact before the court can grant the motion. This is demonstrated by the language of Civ.R. 56(E) which states that if a party does not oppose a motion for summary judgment, "summary judgment, if appropriate, shall be entered against the party." See Mullen v. St. PaulFire Marine Ins. Co. (C.A. 1, 1992), 972 F.2d 446, 452. We will not consider any argument Gruenspan makes in response to the summary judgments, except insofar as those arguments point to issues of material facts in the respective motions and supporting evidentiary materials. Obviously, the same rules we use to review contested motions for summary judgment apply in this case — the motions could only be granted if there were no issues of material fact and the party making the motion was entitled to judgment as a matter of law. See Civ.R. 56(C).
 A. Jurczenko {¶ 13} Although Jurcenko represented the Thompsons as co-counsel with Gruenspan on some of the litigation, he undertook the sole representation of the Thompson defendants when they became dissatisfied with the slow pace of Gruenspan's settlement negotiations. Just days after being given sole authority to act as counsel, Jurczenko settled the CHMA case. Gruenspan maintains that the settlement figure negotiated by Jurczenko was the same figure that he had negotiated but which the Thompson's rejected. Gruenspan's causes of action against Jurczenko generally allege that Jurczenko intentionally tried to terminate Gruenspan's attorney/client relationship in order to step in at the last moment and claim a fee that Gruenspan had earned through years of representation.
 {¶ 14} Jurczenko did not file an appellee's brief. When the appellee fails to file a brief, we may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action. See App.R. 18(C). Unfortunately for Gruenspan, his failure to file opposition to Jurczenko's motion for summary judgment leaves him in the position of failing to submit facts of his own. Since our review of a summary judgment is de novo, we have no choice but to accept the facts stated in Jurczenko's motion for summary judgment.
 1. Tortious Interference with Business Relations
Jurczenko's motion for summary judgment first argued that his representation was protected by the privilege of fair competition. We express no opinion on that argument, choosing instead to affirm the summary judgment on grounds Gruenspan offered no facts to demonstrate that Jurczenko intentionally procured the breach of Gruenspan's contract with the Thompsons.
 {¶ 15} "The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. See Fred Siegel Co., L.P.A. v. Arter Hadden,85 Ohio St.3d 171, 1999-Ohio-260, paragraph one of the syllabus (internal citation omitted).
 {¶ 16} Jurczenko submitted an affidavit in which he asserted that "I did not solicit this representation." Robert Thompson testified during deposition that his growing dissatisfaction with Gruenspan led him to approach Jurczenko about taking over the case. Thompson testified that Jurczenko told him "he's not the type of attorney that would take cases from another attorney * * *." Thompson persisted with Jurczenko, finally saying, "would you please get this thing settled so that I can save my business?"
 {¶ 17} Gruenspan did not offer any facts to refute this assertion. Indeed, shortly before his termination, Gruenspan wrote the Thompsons and acknowledged "that this is not the first time that you have become dissatisfied with my representation in this case." Obviously, the poor relationship between Gruenspan and the Thompsons had existed for several years before Jurcenko's involvement. It follows that the disintegration of the attorney/client relationship began well before Jurczenko's involvement in the case; therefore, as a matter of law, Gruenspan cannot show that Jurczenko interfered with the business relationship between Gruenspan and the Thompsons.
 2. Fraud {¶ 18} Gruenspan's allegations of fraud alleged that Jurczenko failed to disclose settlement negotiations on the CMHA case because Gruenspan was still the attorney of record at the time.
 {¶ 19} The necessary elements of a fraud claim are (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. State ex rel.The Illuminating Co. v. Cuyahoga Cty. Ct. of Common Pleas,97 Ohio St.3d 69, 2002-Ohio-5312, at ¶ 24.
 {¶ 20} The evidence shows that Gruenspan first noted his awareness that the Thompsons were dissatisfied with his representation in a letter dated September 5, 1996. That letter closed with Gruenspan's statement that "I will, therefore, suspend my work on this case unless I get instructions otherwise." Up to that point, however, the Thompsons had not formally terminated Gruenspan. That termination came in a letter dated October 17, 1996. Curiously, on October 15, 1996, Gruenspan sent a court reporter a letter in which he advised that "I am no longer the attorney of record of the above captioned matter." Jurczenko memorialized Gruenspan's termination in a letter dated October 21, 1996. The undisputed evidence shows that Jurczenko's negotiations with CMHA did not begin until after he sent the October 21, 1996 letter to Gruenspan.
 {¶ 21} Gruenspan disputes whether his termination could have been considered final because the court did not approve his motion to withdraw from the case until after a hearing held in November 1996. It was at this same hearing that the court memorialized the terms of the settlement between the Thompsons and CMHA. He thus maintains that he was still actively representing the Thompsons at the time they settled with CMHA.
 {¶ 22} We do not disagree in principle with Gruenspan's argument that Loc.R. 10 of the Cuyahoga County Court of Common Pleas requires that an attorney seeking to withdraw from representation after litigation has been commenced must seek leave from the court. Nevertheless, it would be grossly unjust to apply that rule in the manner suggested by Gruenspan. The court held a hearing on Gruenspan's motion to withdraw because of Gruenspan's insistence that he could not be terminated. In fact, despite filing the motion to withdraw on behalf of his clients, Gruenspan filed his personal opposition to that motion. We understand that Gruenspan did so in an effort to ensure the payment of his attorney fees, but that fact cannot change the nature of what happened. Unbeknownst to the court at the time it conducted the hearing on Gruenspan's conflicting motions, Gruenspan had only minutes earlier filed his first suit against the Thompsons. So not only had Gruenspan told the Thompsons that he would no longer do any work on the case, he indicated to third parties that he was no longer counsel of record and had sued his own client. All of this occurred while Gruenspan was representing to the court that he was still the Thompsons' attorney. It was a functional withdrawal of representation, if not a technical withdrawal for purposes of Loc.R. 10.
 {¶ 23} It follows that for purposes of the fraud claim, Gruenspan's representation had terminated as a matter of law such that Jurczenko, not Gruenspan, had been the sole attorney representing the Thompsons in settlement negotiations with CMHA. Hence, Jurczenko had no duty to disclose to Gruenspan the existence of settlement discussions with CMHA. Despite his equitable lien for attorney fees against the Thompsons, that lien did not extend to Jurczenko. In short, Gruenspan was not in privity with Jurczenko to that extent that any duty to disclose the negotiations would arise.
 3. Breach of Fiduciary Duty {¶ 24} Gruenspan premised his claim against Jurczenko for breach of fiduciary duty on facts that showed that Jurczenko and Gruenspan acted as co-counsel and therefore Jurczenko had a fiduciary responsibility to Gruenspan such that he should have disclosed to Gruenspan that he was acting inconsistently with Gruenspan's interests.
 {¶ 25} To the extent that Gruenspan's cause of action could be construed to assert any claim for relief on actions Jurczenko took after Gruenspan's termination, the court did not err. Having been terminated, Gruenspan was no longer counsel and thus could not claim that any fiduciary duty existed between he and Jurczenko on the basis of the co-counsel relationship. As to the relationship that existed before Gruenspan's termination, we find that the imposition of fiduciary duty between co-counsel would be against the public policy because it could compromise an attorney's duty to represent the best interests of the client.
 {¶ 26} A "fiduciary" is "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." Haluka v. Baker (1941), 66 Ohio App. 308,312. A claim that a fiduciary duty has been breached is essentially a claim of negligence. The party claiming the breach must show "the existence of a duty on the part of the one sued not to subject the former to the injury complained of, a failure to observe such duty, and an injury resulting proximately therefrom." Strock v. Pressnell (1988),38 Ohio St.3d 207, 216 (citation omitted).
 {¶ 27} While there are no Ohio cases directly on point, we think it to be a self-evident principle of ethics that an attorney owes the foremost duty to the client, not to co-counsel. In Beck v. Wecht (2002),28 Cal.4th 289, 48 P.3d 417, the California Supreme Court considered whether one co-counsel may sue another co-counsel for breach of fiduciary duty on the theory that the latter's malpractice in handling their mutual client's case reduced or eliminated the fees the former expected to realize from the case. The court held that "it would be contrary to public policy to countenance actions based on the theory that cocounsel have a fiduciary duty to protect one another's prospective interests in a contingency fee." The court reached this conclusion by recognizing that the paramount concern for counsel is loyalty to the client, not to counsel. The California Court of Appeals stated this point well in Masonv. Levy Van Bourg (1978), 77 Cal.App.3d 60, 143 Cal.Rptr. 389,392:
 {¶ 28} "It is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his clients. (See ABA Code of Professional Responsibility, Canon 5.) This loyalty should not be diluted by a duty owed to some other person, such as an earlier attorney. While, as a practical matter, both the client and former attorney stand to benefit from any recovery in the client's action, their interests are not identical. * * * It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him an obligation to take into account the interests of predecessor attorneys * * *."
 {¶ 29} With this case in mind, we find that Jurczenko owed no fiduciary duty to Gruenspan. His duty, like that of Gruenspan before him, was solely to the Thompsons. Absent the existence of a duty owed by Jurczenko to him, Gruenspan could not prevail on a claim alleging a breach of a fiduciary duty. The court did not err by granting summary judgment.
 4. Legal Malpractice {¶ 30} Gruenspan premised his legal malpractice claim against Jurczenko on allegations that Jurczenko's actions in both the CMHA and Dynes cases were not performed in an ethical and competent manner, resulting in injury to Gruenspan. The complaint does not state any specific facts as to how Jurczenko acted incompetently.
 {¶ 31} There is "no authority recognizing a cause of action in favor of a co-counsel for negligence arising from representation of a mutual client; and we know of none." Evans v. Steinberg (1985),40 Wash. App. 585, 699 P.2d 797, 798; Beck v. Wecht, supra. Gruenspan cites to no Ohio law that holds to the contrary. There is at least one federal case in which a court held that a law firm had a cause of action against its associate for losses the firm sustained due to the associate's malpractice. See Kramer v. Nowak (E.D.Pa. 1995), 908 F. Supp. 1281,1292. But that holding centered on the agency between the firm and its associate and a finding that the associate's duty to the firm did not conflict with the associate's duty to the client. Gruenspan offers no facts that would put his co-counsel relationship with Jurczenko in the same light. It follows that the court did not err by granting summary judgment on the legal malpractice claim against Jurczenko.
 5. Conspiracy {¶ 32} The conspiracy claim for relief was the most factually complete claim for relief, but distilled to its essentials the claim alleged that Jurczenko and the Thompsons acted in concert to deprive Gruenspan of the attorney fee he had earned throughout his representation of the Dynes and CMHA cases.
 {¶ 33} A claim of civil conspiracy requires a showing of: (1) a malicious combination, (2) two or more persons, (3) injury to persons or property, and (4) the existence of an unlawful act independent from the actual conspiracy. Geo-Pro Services, Inc. v. Solar Testing Laboratories,Inc. (2001), 145 Ohio App.3d 514, 527.
Gruenspan's civil conspiracy claim for relief fails as a matter of law because he cannot show the fourth element — the existence of an unlawful act independent from the actual conspiracy. During deposition, Gruenspan testified that he believed the conspiracy was to "settle the case and cut me out of my fee." Assuming this to be true, there is nothing unlawful about it. Because Ohio is a code law state, only those acts for which there is a positive prohibition and specific penalty are considered to be criminal offenses. See R.C. 2901.03(A) and (B). The Revised Code contains no prohibition on the settlement of cases. It is important to understand that settling the CMHA litigation, not the intent to deprive Gruenspan of his fee, was the relevant act for purposes of the conspiracy claim. No matter how malicious their motivation to settle, Jurczenko and the Thompsons could only be held liable for a conspiracy to commit an unlawful act, not simply committing a lawful act with malicious intent. Because Gruenspan could not prove that Jurczenko and the Thompsons committed an unlawful act independent from the conspiracy, he could not, as a matter of law, prevail on the conspiracy claim.
 6. Intentional Infliction of Emotional Distress {¶ 34} The claim for intentional infliction of emotional distress was likewise grounded on Jurczenko's alleged role in conspiring to settle the Thompsons' legal matters to the detriment of Gruenspan's fee.
 {¶ 35} To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show the following: (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. Phung v. Waste Mgt., Inc. (1991), 71 Ohio St.3d 408,410. Extreme and outrageous conduct is conduct that goes beyond all possible bounds of decency and is so atrocious that it is "utterly intolerable in a civilized society." Yeager v. Local Union 20 (1983),6 Ohio St.3d 369, 375. "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to sustain a claim for relief. Id.
 {¶ 36} We earlier noted that Jurczenko submitted uncontroverted evidence that he did not ask the Thompsons for permission to take over representation and, in fact, resisted the idea. Consequently, we can say as a matter of law that he did not engage in any behavior of the kind that would be considered outrageous enough to support a claim for intentional infliction of emotional distress.
 {¶ 37} Moreover, since Gruenspan did not file any opposition to Jurczenko's motion for summary judgment, he did not offer any evidence to show that he suffered from severe emotional distress. Granted, Gruenspan might have been very angry indeed over his perceived treatment, but that kind of response is not the type of serious emotional injury that would support the claim. Knief v. Minnich (1995), 103 Ohio App.3d 103, 108.
B. CHMA, Guest, Kelley, O'Bryan, and Summers
 {¶ 38} In addition to suing his clients (the Thompsons and their several companies) and their subsequent attorney (Jurczenko), Gruenspan brought tort claims against the Thompsons' legal adversaries and the attorneys and law firms who represented those legal adversaries. The action underlying the claims raised against these particular defendants involved a Thompson company called TomRob. TomRob and CMHA entered into certain contracts, and TomRob eventually brought suit against CMHA for breach of those contracts. Defendant Guest was a CMHA staff attorney. Defendants O'Bryan and Summers are attorneys with the law firm of Kelley, McCann Livingstone (now known as Taft, Stettinius 
Hollister, LLP.). Kelley McCann represented CMHA as legal counsel in its defense against TomRob. Gruenspan alleged that he negotiated a settlement offer in the TomRob litigation but the Thompsons rejected that offer. Shortly after being fired as the Thompsons' attorney, Jurczenko hired on and reached the same settlement amount that Gruenspan had earlier negotiated. The claims against CMHA and the Kelley McCann defendants are that they conspired with Jurczenko to rob Gruenspan of the attorney fee that he earned by negotiating the first settlement. The specific claims were for conspiracy, tortious interference, fraud and intentional infliction of emotional distress.
 1. Kelley McCann defendants {¶ 39} The Kelley McCann defendants' primary argument in support of summary judgment, and the one that we find dispostive, is that they are immune from third party actions filed by disappointed litigants.
 {¶ 40} In Scholler v. Scholler (1984), 10 Ohio St.3d 98, the first paragraph of the syllabus states, "[a]n attorney is immune from liability to third persons arising from his performance as an attorney in good faith on behalf of, and with the knowledge of his client, unless such third person is in privity with the client or the attorney acts maliciously."
 {¶ 41} Gruenspan made no allegation that he was in privity with the Kelley McCann defendants, and there are no facts which would show any privity. The affidavits submitted in support of the motions for summary judgment show that Kelley McCann defendants were engaged in the active representation of their clients, not with Gruenspan. Nor are there any facts to show that the Kelley McCann defendants acted with malice. Those defendants submitted affidavits which attested to their good faith throughout their representation of CMHA. Gruenspan did not respond to the motion for summary judgment, so he failed to present evidence to create a genuine issue of material fact on whether the Kelley McCann defendants acted with malice.
 {¶ 42} The facts before the court show that none of the Kelley McCann defendants had prior knowledge of the Thompsons' decision to terminate Gruenspan and hire Jurczenko. They received notice of Gruenspan's termination from Jurczenko, who then advised them that the Thompsons wished to settle against CMHA. As noted by Summers in his affidavit, he had an ethical obligation to inform his client, CMHA, of the Thompsons' desire to settle. In Evans v. Jeff D. (1986), 475 U.S. 717,728, fn. 14, the United States Supreme Court stated:
 {¶ 43} "Generally speaking, a lawyer is under an ethical obligation to exercise independent professional judgment on behalf of his client; he must not allow his own interests, financial or otherwise, to influence his professional advice. ABA, Model Code of Professional Responsibility E.C. 5-1, 5-2 (as amended 1980); ABA, Model Rules of Professional Conduct 1.7(b), 2.1 (as amended 1984). Accordingly, it is argued that an attorney is required to evaluate a settlement offer on the basis of his client's interest, without considering his own interest in obtaining a fee; upon recommending settlement, he must abide by the client's decision whether or not to accept the offer, see Model Code of Professional Responsibility E.C. 7-7 to E.C. 7-9; Model Rules of Professional Conduct 1.2(a)."
 {¶ 44} As Summer states, he had no legal or ethical duty with respect to any fees that Gruenspan might have been owed by the Thompsons. His ethical duty went to his clients, not to Gruenspan.
 2. CMHA {¶ 45} The court did not err by granting summary judgment to CMHA because CMHA was protected by governmental immunity for all acts short of those showing malice, bad faith or a wanton or reckless manner.
 {¶ 46} CMHA is a "body corporate and politic, see R.C. 3735.31, and hence qualifies as a political subdivision. See R.C. 2744.01(F). As a general principle, political subdivisions are not liable in damages unless a specific exception to that immunity exists. This applies particularly to intentional tort claims of fraud and intentional infliction of emotional distress. Wilson v. Stark Cty. Dept. of HumanServ. (1994), 70 Ohio St.3d 450, 452. Likewise, a political subdivision is immune from a claim of intentional interference with business interests. See Allied Erecting Dismantling Co., Inc. v. Youngstown,151 Ohio App.3d 16, 2002-Ohio-5179; Farra v. Dayton (1989),62 Ohio App.3d 487. There is no evidence that any of the exceptions to general immunity would apply, so the court did not err by granting summary judgment on all claims against CMHA.
 3. Guest {¶ 47} The court likewise did not err by granting summary judgment to defendant Guest. As an employee of CMHA, Guest was covered by the immunity conferred by R.C. 2744.03(A)(6). That section states that an employee of a political subdivision is immune from liability unless the employee's acts or omissions were outside the scope of employment or were made in a malicious, bad faith, wanton or reckless manner.
 {¶ 48} There were no facts to show that Guest acted outside the scope of his employment. The undisputed facts show that Guest acted within the scope of his employment and that he did not act with malice, bad faith, or in a wanton or reckless manner. Since Gruenspan submitted no evidence to contradict these facts, no genuine issue of material fact existed and Guest was entitled to judgment as a matter of law on grounds that he was immune from damages.
C. Seikel and Seikel, Koly Co.
 {¶ 49} John Seikel and Seikel, Koly Co. ("Seikel") were accountants who represented the Thompsons in a construction project known as Dynes Village. Dynes Village was built with a mix of low-income units. Those units qualified for certain low-income housing tax credits which the Thompsons intended to sell to a group of investors. Any profit on the project would be realized from the sale of the tax credits. The Thompsons retained Seikel to prepare an audit report and the 1989 tax returns for the Dynes Village project. When Seikel erroneously stated the tax credits on the income tax return, those tax credits were lost, as was the ability to sell them for a profit. In 1991, the Thompsons brought suit in the court of common pleas against Seikel for accounting malpractice stemming from that project. In 1993 and 1994, the Thompsons brought the same causes of action, plus causes of action for RICO violations in the United States District Court for the Northern District of Ohio. Seikel filed a motion to dismiss the Thompsons' federal claims, and the federal court granted the motion in 1995. Seikel then filed a motion for summary judgment in the court of common pleas and argued that the federal court's dismissal was a dismissal on the merits and that the Thompsons' state court claims were barred by principles of res judicata. While Seikel's motion for summary judgment remained pending before the court, the Thompsons terminated Gruenspan's legal services. Hence, at the time the court granted Seikel's motion for summary judgment, the Thompsons were represented by Jurczenko, not Gruenspan. The Thompsons appealed from the summary judgment rendered in Seikel's behalf. Before this court heard the appeal on the merits, the parties reached a settlement during a prehearing conference. Seikel agreed to pay the Thompsons $77,500 in exchange for a complete release with no admission of liability on its part. Gruenspan argued that he had perfected an attorney's lien on the proceeds of the settlement between the Thompsons and Seikel by serving Seikel and its counsel with a "notice of lien" relating to his claim for attorney fees.
 {¶ 50} Gruenspan had a valid claim against the Thompson defendants for legal fees that he earned prior to his termination because his contract with the Thompsons specified that he would be "compensated for work already performed." But his contractual right to fees earned prior to the termination of his legal services did not translate into an equitable lien against the party-defendants in the Dynes litigation. SeePennsylvania Co. v. Thatcher (1908), 78 Ohio St. 175. We considered this issue squarely in Meros v. Rorapaugh (Nov. 22, 2000), Cuyahoga App. No. 77611. Meros, a former attorney, represented clients on a contingent fee basis. When the clients terminated him, Meros sought the equivalent of his contingency fee from the insurance company representing the defendants in his clients' action. Although noting that Meros had an equitable lien against his clients, we stated, "[t]he problem with Meros' approach to enforcing his equitable lien is that his remedy is through the client * * *, and not through parties releasing funds to the client."
 {¶ 51} The analysis we used in Meros applies here. Gruenspan had every right to enforce his equitable lien against the Thompsons, but he could not hold Seikel liable for paying settlement proceeds to the Thompsons. Gruenspan's claims against Seikel failed as a matter of law.
 III {¶ 52} Gruenspan's next set of arguments challenge the court's findings of fact and conclusions of law stemming from the bench trial on his claims against the Thompsons. We note that these errors relate solely to the Thompsons and their affiliated companies. The Thompsons have not filed a response brief.
 A {¶ 53} The first argument is that the court's findings of fact and conclusions of law were insufficient as a matter of law. Gruenspan maintains that the findings of fact issued by the court amount to nothing more than a restatement of the "evidence presented" and is not a finding of fact. His specific point of contention is that the court failed to make individual findings as to attorney fees, even though the court treated the claims separately.
 {¶ 54} Under Civ.R. 52, when questions of fact are tried by the court without a jury, the court may render a general verdict unless one of the parties, "in writing," requests otherwise. If a party does request written findings of fact, the court has a mandatory duty to issue such findings. See In re Adoption of Gibson (1986), 23 Ohio St.3d 170.
 {¶ 55} Gruenspan did not file a written request for findings of fact and conclusions of law. He therefore waived the right to challenge the lack of specific findings by the court. See Pawlus v. Bartrug
(1996), 109 Ohio App.3d 796, 801. But this is not to say that the court erred by failing to make any findings. The court did make factual findings, so it fulfilled its duty to provide us facts sufficient to permit a review. See Drake Ctr., Inc. v. Ohio Dept. of Human Serv. (1998), 125 Ohio App.3d 678, 705-706. Deficiencies within some factual findings are, of course, another matter that we will address as necessary under specific arguments.
 B {¶ 56} Gruenspan's next series of arguments point to the court's factual findings and argue that its legal conclusions are unsupported by the evidence. Despite phrasing these arguments under the guise of the sufficiency of the evidence, Gruenspan is really claiming that the court's factual findings were against the manifest weight of the evidence. There are a number of issues raised, ranging from the formation of the attorney/client relationship to the actual fees earned during that representation.
 {¶ 57} In a bench trial, the trial judge acts as the trier of fact and determines the credibility of witnesses and the weight to be given the evidence. State v. Walker (1985), 26 Ohio App.3d 29, 32. A judgment is against the manifest weight of the evidence if it is "so manifestly contrary to the natural and reasonable inferences to be drawn from the evidence as to produce a result in complete violation of substantial justice." Sambunjak v. Bd. of Rev., Ohio Bur. of Empl. (1984),14 Ohio App.3d 432, 433. A judgment will not be reversed as being against the manifest weight of the evidence where some competent, credible evidence exists to support the judgment. Seasons Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77, 80.
 {¶ 58} Gruenspan submitted two separate documents which he claimed established both an hourly fee arrangement and a contingency fee arrangement. The first agreement was dated January 10, 1995, and was to cover "our claim for breach of contract, and/or other damages or loss, against CMHA, HUD, and others, as a result of the occurrence on or about 1984 to present." The agreement provided for a retainer fee of $5,000 and a contingency fee as applicable here, of forty percent of the amounts collected.
 {¶ 59} The second agreement was contained in a July 28, 1995 letter drafted by Gruenspan and approved in writing by the Thompsons. The letter specifically mentions the case of Dynes Corporation v. Seikel, etal., that being the accountant malpractice action. It also purports to cover "various legal matters" for the Thompsons and their affiliated companies. This agreement provides for Gruenspan's representation at an hourly fee of $155.
 1. Contingency Fee Billings {¶ 60} The primary issue faced by the court was the amount of attorney fees that Gruenspan earned during his work on the CMHA case for the Thompsons. In Reid, Johnson, Downes, Andrachik Webster v.Lansberry (1994), 68 Ohio St.3d 570, the second and third paragraphs of the syllabus state:
 {¶ 61} "2. When an attorney representing a client pursuant to a contingent-fee agreement is discharged, the attorney's cause of action for a fee recovery on the basis of quantum meruit arises upon the successful occurrence of the contingency.
 {¶ 62} "3. A trial court called upon to determine the reasonable value of a discharged contingent-fee attorney's services in quantum meruit should consider the totality of the circumstances involved in the situation. The number of hours worked by the attorney before the discharge is only one factor to be considered. Additional relevant considerations include the recovery sought, the skill demanded, the results obtained, and the attorney-client agreement itself."
 {¶ 63} Any request for a quantum meruit recovery necessarily invokes the equitable jurisdiction of the court. Sonkin MelenaCo., L.P.A. v. Zaransky (1992), 83 Ohio App.3d 169, 175. That being the case, the court's decision to award attorney fees on a quantum meruit basis is reviewable only for an abuse of discretion. Reid, Johnson,Downes, Andrachik Webster, 68 Ohio St.3d at 577; Goldauskas v.Elyria Foundry Co. (2001), 145 Ohio App.3d 490. An abuse of discretion is more than just an error of judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 64} The court examined at length the content of the contingency fee agreement between Gruenspan and the Thompsons, as well as the amount of hours that Gruenspan worked on the various matters falling under the agreement. Because Gruenspan claimed the fees under the equitable remedy of quantum meruit, the court further considered all other factors that might balance equity in one way or another.
 {¶ 65} The court had serious reservations about the scope of the contingency agreement. It believed that if the agreement were read literally, it "turns the whole case over to Mr. Gruenspan and relieves Mr. Thompson of any opportunity to have any voice in determining it whatsoever." These reservations arose from a provision which purported to give Gruenspan a lien "for all past and future fees owed," and further prohibited the clients from obtaining any settlement "without complete prior approval of the lawyer." That provision was clearly voidable. InHoleton v. Crouse Cartage Co., 92 Ohio St.3d 115, 128, 2001-Ohio-109, the Supreme Court stated:
 {¶ 66} "* * * this court has never tolerated an `illegal restriction upon the right to compromise.' Davy v. Fid. Cas. Ins.Co. (1908), 78 Ohio St. 256, 270, 85 N.E. 504, 507. `The law of Ohio will tolerate no lien in or out of the profession, as a general rule, which will prevent litigants from compromising, or settling their controversies, or which, in its tendencies, encourages, promotes or extends litigation.' Id., 78 Ohio St. at 268-269, 85 N.E. at 507, quotingWeakly v. Hall (1844), 13 Ohio 167, 175, 1844 WL 22."
 {¶ 67} Settlement of the CMHA action was the sticking point between the parties. Gruenspan testified that he negotiated a settlement of $259,636.69, but the Thompsons refused to accept that figure. Just days after they terminated Gruenspan, the Thompsons retained Jurczenko who settled with CMHA for that same amount. For their part, the Thompsons testified that they kept asking Gruenspan to terminate the litigation. The evidence showed that they were in dire financial straits, having folded all of their companies and having their house placed in foreclosure. Robert Thompson was in poor health. He testified that when informed of CMHA's settlement offer, he told Gruenspan that "I wanted to collect the money and forget this matter and put it behind us. I wanted a settlement, as it had been going on, and on, and on." Other evidence showed that a few months before Gruenspan's termination, Robert Thompson sent Jurczenko a letter in which he stated that "Charles Gruenspan is filing more motions and I think he is only antagonizing the judge. It is very important that you call me right away because we have to get this case settled." Thompson's claim that Gruenspan had been filing "more motions" was substantiated at least in part by testimony showing that Gruenspan filed a notice of appeal from a July 26, 1996 judgment without authorization from the Thompsons. Robert Thompson testified that Gruenspan refused to dismiss the appeal even though ordered to do so. It was only after the Thompsons terminated Gruenspan and brought in Jurczenko that the appeal was dismissed.
 {¶ 68} This is not to say that the litigation which Gruenspan prosecuted on behalf of the Thompsons in the CMHA case was frivolous. This evidence does, however, lend some credence to Robert Thompson's testimony that Gruenspan was refusing to settle with CMHA in order to increase his contingency fee. And there can be no doubt that Gruenspan's fee had become the primary point of contention. Gruenspan's October 24, 1996 letter acknowledging his termination made this veiled threat:
 {¶ 69} "Why take your greatest asset and strongest defender and ally and turn him into an adversary? If the only purpose of terminating me is to try to save money on my fees, this could be counterproductive. If you truly want my services terminated, I will do everything in my power to protect my family's interest in these cases. These cases are tough enough without having to deal with me too."
 {¶ 70} In the end, the court relied on competent, credible evidence to award a contingency fee, although not in the amount specified under the contingency fee agreement. By the time of his termination, Gruenspan had ceased to follow his client's wishes to settle the case and held out for a larger settlement. The fee agreement itself was suspect, as it gave Gruenspan a right of refusal over any settlement of the litigation. Finally, the results obtained by Jurczenko were identical to the settlement that Gruenspan negotiated but refused to accept. The court could reasonably conclude that the amount of fees specified in the contingency fee agreement should be modified.
 2. Hourly Fee Billings {¶ 71} The letter agreement dated July 28, 1995 stated that Gruenspan would represent the Thompsons on an hourly fee basis for all projects other than those relating to CMHA. The letter also incorporated the Thompsons' acknowledgment that they owed "all the amounts contained in the statements dated August 1, 1995, from CHARLES GRUENSPAN CO., L.P.A." Those hourly fees totaled $86,794.84 as of August 1, 1995. The court questioned the amount of these legal fees citing, for example, to Gruenspan's fee bill for October 1994, in which Gruenspan billed the Thompsons for 260.2 hours. That number of hours worked would have had him working 8.37 hours every day of the month. The court found the letter agreement "ambiguous and uncertain" because it was addressed to the Thompsons individually even though the referenced legal matters all pertained to the Thompsons' corporations. Although it did not say explicitly, we assume that the court meant to absolve the Thompsons of liability in their individual capacities. Nevertheless, the court found that Gruenspan was entitled to some compensation for his services.
 {¶ 72} The court erred as a matter of law when it voided the letter agreement on grounds that it was "ambiguous and uncertain." When a party to a contract claims that the contract is ambiguous, the court must give words and phrases to their plain, ordinary, or common meaning.Gomolka v. State Auto. Mut. Ins. Co. (1982), 70 Ohio St.2d 166, 167-168. If a contract is clear and unambiguous, its interpretation is a matter of law and there is no issue of fact. Nationwide Mut. Fire Ins. Co. v. GumanBros. Farm (1995), 73 Ohio St.3d 107, 108, 1995-Ohio-214. However, where the language of a contract is reasonably susceptible to more than one interpretation, the meaning of ambiguous language is a question of fact.Ohio Historical Society v. General Maintenance Engineering Co.
(1989), 65 Ohio App.3d 139, 146.
 {¶ 73} The contract referred to the Dynes Corporation litigation and "various legal matters." It is true that it did not mention the other corporate matters by name, but there can be no doubt that the Thompsons agreed to have Gruenspan represent their affiliated companies. To be sure, Gruenspan performed legal work for the Thompsons as individuals. But when Gruenspan sent billing invoices for the Thompsons' corporate work, the Thompsons made no effort to correct the billing statements to show that the companies and not the Thompsons were the true obligors for Gruenspan's legal fees. Moreover, they did not sign the letter agreement in their representative capacities for their companies. This evidence, which was uncontroverted, convinces us that, as a matter of law, the Thompsons were individually liable for Gruenspan's legal fees.
And if the Thompsons were individually liable for Gruenspan's legal fees, it follows that the court also erred when it absolved Dolores Thompson of any liability under the letter agreement. The court found that her involvement in the corporate matters was so "minuscule as to be the basis for a failure of justice if she were to be required to be responsible for these payments * * *." It may be that Dolores Thompson had nominal operational involvement with the Thompson corporations, but she was the president and sole shareholder of at least one of the companies. Moreover, she signed the letter agreement as an individual along with her husband, Robert. And at least some of the legal fees were produced for projects that were unrelated to the Thompsons' corporate affiliates. At the very least, the court had the obligation to determine which legal fees arose as a result of non-corporate legal work and assess Dolores' share accordingly.
 3. Award of Legal Fees {¶ 74} The court conceded that it found it "virtually impossible to arrive at a mathematically precise amount of money that is due Mr. Gruenspan from Mr. Thompson." It settled for a flat amount of $125,000 to cover all the legal work. In doing so it did not attempt to separate out what amount of that award constituted a quantum meruit award under the contingent fee work and what amount constituted an award for the hourly fee work.
 {¶ 75} We find the court both erred and abused its discretion by awarding Gruenspan only $125,000 in fees. We agree with the court that these were difficult questions for it to resolve. Nevertheless, the court should have made it clear just what work made up the total amount of the award, for it is impossible for us to review the award without that finding. For example, even though Gruenspan had been terminated from the CMHA case, that termination happened just weeks before the case was settled for an amount that Gruenspan claimed to have negotiated. The court relied on competent, credible evidence to show that Gruenspan refused to settle in hopes of negotiating a higher settlement. Yet the fact remains that he had at least negotiated the final settlement number. His work on the case was more than just minimal, and his quantum meruit award should have reflected that fact. In other words, while he was not entitled to forty percent of the settlement, he was entitled to an award that reflected the amount of work he performed. If the court believed that Gruenspan's actions over the years prolonged the case, its award should have said as much so that we could rationally review the court's award.
 {¶ 76} As for the hourly fee work, there is no question that Gruenspan documented his billing over the years. The court may have had doubts as to the veracity of some of these bills, and the evidence would have supported some of those doubts. But many of the hourly fees went unchallenged. Given the meticulous documentation of the work, the court had no reason not to make a more specific damage award for the work on account. The court cited to only a few examples in which it believed that Gruenspan padded his fee, yet those few examples could not taint the entire claim, at least not without more specific findings by the court. And all of the hourly fee work that had not been paid was subject to interest at ten percent. We see nothing in the damage award that would suggest that the court calculated interest.
 4. Disposition {¶ 77} We find that this matter should be remanded back to the court for redetermination of damages. First, the court must clearly define what amount of the damage award goes to quantum meruit and what amount of the damage award goes to the hourly fee work. Second, the court's findings of fact and conclusions of law must state its reasons for arriving at the awards. We trust that these findings will clearly state the elements of the hourly fee, including the court's reasons for denying recovery on certain billings. Third, the court must consider interest owing on parts of the hourly fee award.
Judgment affirmed in part; reversed in part and remanded.
 MICHAEL J. CORRIGAN PRESIDING JUDGE
 JAMES J. SWEENEY, J., and SEAN C. GALLAGHER, J., CONCUR.