Ehrlich *v.* Stern.

Lori Ehrlich & others[1] *vs.* Max D. Stern & others.[2]

No. 07-P-1144.

Suffolk. April 7, 2008. - June 29, 2009.

Present: McHugh, Cohen, & Grainger, JJ.

*"Anti-SLAPP" Statute. Practice, Civil,* Motion to dismiss. *Constitutional Law,* Right to petition government. *Statute,* Construction.

Discussion of the law applicable to motions brought pursuant to G. L. c. 231, § 59H, a statute designed to protect individuals against what has come to be known as strategic litigation against public participation, or "SLAPP." [535-538]

In an action brought against a group of attorneys and law firms (defendants), claiming that their actions in filing consumer class actions against a third party had purposely hampered the settlement of the plaintiffs' related lawsuit against the third party in violation of the defendants' contractual and professional obligations, the trial court judge did not err in denying the defendants' special motion to dismiss, brought under G. L. c. 231, § 59H, the "anti-SLAPP" statute, where, although the defendants' role in filing the class actions was the paradigm of petitioning activity [538], the defendants' disclosure of certain confidential material was not, given that it appeared on a Web site designed to disseminate to the public information about the class action complaints and to attract clients [538-542]; moreover, the plaintiffs' claim that the defendants undermined the settlement in order to proceed with separate litigation more beneficial to the defendants was similarly not an allegation that implicated protected petitioning activity [542-543].

Civil action commenced in the Superior Court Department on April 3, 2006.

A special motion to dismiss and related motions were heard by *Allan van Gestel,* J.

*Kevin T. Peters* for Max D. Stern & another.

*Jan R. Schlichtmann (Scott Dullea* with him) for the plaintiffs.

[1]Jan R. Schlichtmann and Jan R. Schlichtmann, Attorney at Law, PC.

[2]Kevin Berry; Cozen O'Connor (a professional corporation); Stern, Shapiro, Weissberg & Garin, LLP; Thomas Sobol; Steve Berman; Hagens Berman Sobol Shapiro, LLP; Garve Ivey; and Ivey & Ragsdale (a partnership).

McHugh, J. Concerned about what they claimed were false representations Nestle Waters North America, Inc. (Nestle), was making about the source and quality of water it sold under the "Poland Spring" label, several Nestle competitors hired lawyers to bring suit. The lawyers concluded that consumers as well as competitors had been adversely affected by the false representations, so they contemplated pressing a consumer class action along with the competitor claims. To that end, the lawyers designated plaintiff Lori Ehrlich as the putative class representative and engaged defendant Max D. Stern, a Boston attorney, to represent the class. Ultimately, one of the lawyers, plaintiff Jan R. Schlichtmann, negotiated with Nestle to settle both the consumer and the competitor claims, but for reasons that will become apparent as the narrative proceeds, the settlement foundered.

Schlichtmann and Ehrlich, claiming that the other lawyers purposely torpedoed the settlement in violation of their contractual and professional obligations, brought this action against them, Schlichtmann to recover the fees he would have enjoyed had the settlement succeeded, and Ehrlich to recover the value of the somewhat intangible right she would have enjoyed under the same circumstances. Defendants Stern and his law firm, Stern, Shapiro, Weissberg & Garin, LLP (collectively, Stern), filed a special motion to dismiss the action pursuant to G. L. c. 231, § 59H, a law designed to protect individuals against what has come to be known as strategic litigation against public participation or "SLAPP." After hearing, a judge of the Superior Court denied the motion and Stern appealed. We affirm.

*Background.* Distilled from the complaint and the affidavits filed in connection with the anti-SLAPP motion, the basic facts are these. The competitors were four in number,[3] each of which was engaged in the bottled water business. Because their separate identities are irrelevant to the issues raised by the present appeal, we shall refer to them simply as the "competitors."

The competitors hired Schlichtmann, defendant Thomas Sobol, defendant Garve Ivey, and their respective firms[4] to represent them under a contingent fee agreement. The three were joined

---

[3]Glenwood Farms, Inc.; Carrabassett Spring Water Company; Tear of the Clouds, LLC; and Vermont Pure Holdings, Ltd.

[4]Sobol was a member of defendant Hagens Berman Sobol Shapiro, LLP;

by Kevin Berry and his firm,[5] who represented one of the competitors. The agreements between the competitors and the attorneys provided that the attorneys also could represent a class of consumers who had been adversely affected by the Nestle representations. Eventually, the lawyers selected Ehrlich as a "potential representative of" that class.

Recognizing the potential conflicts inherent in the relationships just described, the lawyers, the competitors, and Ehrlich agreed that each of the clients would be separately represented and that they all would sign a joint litigation agreement allowing them to work together to the full extent of their common interests. Ultimately, such an agreement materialized and contained, among other things, confidentiality provisions that figure in the present litigation and will be described later. In any event, the plans for separate representation of each interest led Sobol, on behalf of all parties, to engage Stern to provide independent representation for the consumer class.

With the competitors and a potential class representative in place, the lawyers approached Nestle with details about their planned lawsuit and, after discussions, agreed to a mediation process to see if they could settle before actual litigation began. After several mediation sessions, a disagreement broke out about the appropriateness of a settlement that Nestle offered. The disagreement left Schlichtmann and Ehrlich on one side and the remaining attorneys on the other. The disagreement prompted Ehrlich to fire Stern, Sobol, and Ivey.[6]

With that trio out of the picture, Schlichtmann proceeded to negotiate a settlement with Nestle on behalf of the competitors and the consumer class. In essence, the settlement called for payments of substantial sums of money to the competitors and, for the class, payments of $500,000 to an environmental cause of Ehrlich's choosing each year for five years.

After Nestle accepted the settlement, Stern, Sobol, and Ivey,

Ivey was a member of Ivey & Ragsdale; and Schlichtmann was a member of Jan R. Schlichtmann, Attorney at Law, P.C. For present purposes, there is no difference between the individual lawyers and their firms, so our discussion will focus on the lawyers alone.

[5]Cozen O'Connor.

[6]Berry apparently had no role in class representation and confined himself to representation of one of the competitors.

who by then had found new class representatives, commenced consumer class actions in a number of jurisdictions, including Connecticut Superior Court and this case in Superior Court, and began dissemination of information regarding the class claims against Nestle on a Web site called bottledwaterfraud.com, and through other media. As a result, Nestle withdrew from the settlement, causing Schlichtmann to lose approximately $9 million in anticipated legal fees and Ehrlich to lose her anticipated right to direct $2.5 million of Nestle's money to environmental causes she favored.[7,8]

The complaint filed by Schlichtmann and Ehrlich contains twelve counts, six on Ehrlich's behalf and six on Schlichtmann's, claiming breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, tortious interference with advantageous relations, breach of fiduciary duty, and civil conspiracy. In form, the complaint's first thirty-five paragraphs are essentially factual, and each specific count, after incorporating all the factual paragraphs, simply labels those facts with one of the six claims for relief. At the end, there is a jury demand and a single paragraph seeking "damages, costs, and attorney[']s fees . . . and such other and further relief as the Court deems just."

Looking past labels to substance, the claims Schlichtmann and Ehrlich have mounted fall into three general categories. First is a claim that commencement of the class action suits caused damage to Schlichtmann and to Ehrlich because it resulted in Nestle's withdrawal of the settlement offer that would have conferred a benefit on them personally. Second is a claim that Stern, Ivey, and Sobol publicly disclosed certain information in violation of the joint representation agreement and that the disclosure also caused Nestle's withdrawal from the settlement. Finally, they allege that Stern, Ivey, and Sobol actively worked to undermine,

---

[7]Because the only issue in this case concerns whether the anti-SLAPP motion was correctly denied, we have no occasion to decide whether Ehrlich's anticipated right to send Nestle's money to destinations of her choosing is sufficient to give her standing to maintain this action.

[8]Three of the competitors, Glenwood Farms, Inc.; Carrabassett Spring Water Company; and Tear of the Clouds, LLC, later filed actions against Ivey and Sobol alleging that their commencement of the consumer class actions with knowledge of the likely impact on the settlement violated duties Ivey and Sobol owed them. A jury agreed and awarded the three competitors the amount they would have received had the settlement proceeded to fruition.

frustrate, and interfere with ongoing settlement negotiations so that they could pursue a course of litigation more advantageous to themselves.

After this action was commenced, Stern filed a motion to dismiss pursuant to G. L. c. 231, § 59H. A judge of the Superior Court denied the motion saying that the complaint did not focus on petitioning activity alone. Instead, the judge said, the complaint focused on the "tortious acts, under the representational and co-counsel circumstances and the alleged harm to [Schlichtmann and Ehrlich] flowing therefrom which is the gravamen of their claims. Ehrlich's and Schlichtmann's claims may have many shaky parts thereto that may not survive challenges under Rule 56 or at trial, but an attack on petitioning they are not."[9]

Stern appeals from the judge's denial of the anti-SLAPP motion, but we agree with the judge and, therefore, affirm.

*Discussion. A. Law applicable to motions brought pursuant to G. L. c. 231, § 59H.* Section 59H, inserted by St. 1994, c. 283, § 1, broadly defines protected petitioning activity as "any written or oral statement . . . reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body" or "reasonably likely to enlist public participation in an effort to effect such consideration." In other words, petitioning activity includes all "statements made to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly." *North Am. Expositions Co. Ltd. Partnership* v. *Corcoran*, 452 Mass. 852, 862 (2009), quoting from *Global NAPS, Inc.* v. *Verizon New England, Inc.*, 63 Mass. App. Ct. 600, 605 (2005).[10]

---

[9]After argument of this appeal, the case proceeded in Superior Court, where summary judgment ultimately entered dismissing the claims on the merits. That dismissal does not moot the present appeal, for the attorney's fees § 59H provides remain at issue because, if a special motion to dismiss is allowed, the court "shall" award the moving party reasonable attorney's fees, and costs, including those incurred for the motion and any related discovery matters. G. L. c. 231, § 59H, inserted by St. 1994, c. 283, § 1.

[10]See *Wenger* v. *Aceto*, 451 Mass. 1, 5-6 (2008) (attorney's filing of criminal complaint against former client for larceny by check was petitioning); *MacDonald* v. *Paton*, 57 Mass. App. Ct. 290, 293-295 (2003) (Web site that called town selectman a "Gestapo agent" was petitioning, as a "technological version of a meeting of citizens on the Town Green"); *Plante* v. *Wylie*, 63 Mass. App. Ct. 151, 159 (2005) (attorney writing letter on behalf of client regarding

Procedurally, consideration of an anti-SLAPP motion has two components.

"[T]he party seeking dismissal (the defendant) must demonstrate, through pleadings and affidavits, that the plaintiff's claims are based on 'petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.' . . . If this showing is not made, the special motion must be denied. If the showing is made, then the burden shifts to the nonmoving party (the plaintiff) to demonstrate, again by pleadings and affidavits, that the moving party's petitioning activities were 'devoid of any reasonable factual support or any arguable basis in law' and the petitioning activities 'caused actual injury to the responding party.' G. L. c. 231, § 59H. If these showings are made, by a preponderance of the evidence, then the special motion to dismiss must be denied. If that standard is not met for one or both elements, the special motion to dismiss must be allowed."

*Wenger* v. *Aceto*, 451 Mass. 1, 5 (2008) (citation omitted).

In applying those principles, two points are of particular importance. First, the anti-SLAPP inquiry produces an all or nothing result as to each count the complaint contains. Either the count survives the inquiry or it does not, and the statute does not create a process for parsing counts to segregate components that can proceed from those that cannot. See *Cadle Co.* v. *Schlicht-*

---

settlement of administrative proceeding was petitioning because "the statute . . . must be construed to include statements made by one participant in a pending governmental proceeding to another in an effort to settle the controversy"); *Wynne* v. *Creigle*, 63 Mass. App. Ct. 246, 254 (2005) (firefighter's surviving spouse's statements to fire department and local newspaper were petitioning, as "sufficiently tied to and in advancement of her petition for benefits as the widow of a firefighter"). Contrast *Cadle Co.* v. *Schlichtmann*, 448 Mass. 242, 250 (2007) (attorney-created Web site describing collection firm's allegedly illegal business practices was not petitioning, as its purpose was to attract customers, not seek government redress); *Global NAPS, Inc.* v. *Verizon New England, Inc.*, *supra* at 601, quoting from *Duracraft Corp.* v. *Holmes Prod. Corp.*, 427 Mass. 156, 161 (1998) (affirming denial of § 59H motion because claims stemmed from statements that Verizon's regulatory affairs chief made in a Boston Globe interview that were "merely an oblique reference to Verizon's petitioning activity and . . . not a protected instance of 'full participation . . . and robust discussion of issues' " under government review).

*mann*, 448 Mass. 242, 249 (2007), quoting from *Duracraft Corp. v. Holmes Prod. Corp.*, 427 Mass. 156, 167-168 (1998) ("We require, . . . as a threshold matter to invoke the statute's protection, that the party seeking dismissal demonstrate, through pleadings and affidavits, that the claims against it are ' "based on" the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.' . . . At this early stage of the proceedings, '[t]he focus solely is on the conduct complained of, and, if the *only* conduct complained of is petitioning activity, then there can be no other "substantial basis" for the claim' "); *Wenger, supra* at 9 (ordering dismissal of two counts of the complaint but requiring the third to proceed). Compare, e.g., Mass.R.Civ.P. 56(d), 365 Mass. 824 (1974) (containing procedure for determining which facts are in dispute and which are not in cases where full summary judgment is not warranted).

The all or nothing result of the anti-SLAPP inquiry provides a remedy suited to the nature of the problem the statute was designed to remedy, namely that "[t]he objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech" and "to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft Corp., supra* at 161 (citation omitted). Quickly terminating a SLAPP suit or a SLAPP count removes the unwarranted intimidation or punishment produced by the claim's very existence and leaves to substantive law the task of sorting out rights and responsibilities bound up in any surviving counts.

A second noteworthy point has to do with a plaintiff's burden of showing "by a preponderance of the evidence" that the petitioning activity in question is "devoid of any reasonable factual support or any arguable basis in law" and that the petitioning activities "caused actual injury to the responding party." *Wenger, supra* at 5, quoting from G. L. c. 231, § 59H. Quite logically, that burden only arises after a defendant shows that the lawsuit, or a count the complaint contains, is aimed at petitioning activity alone. Until then, there is no reason to terminate the lawsuit quickly. When a defendant makes that showing, imposing a requirement that a plaintiff show the suit's lack of arguable merit in fact or law and an injury resulting from petitioning activities balances the parties' competing interests. See *Baker v. Parsons*, 434 Mass. 543, 553-555 (2001).

Requiring a plaintiff to make those showings by a preponderance of the evidence, though, requires the judge to assess the strength of competing affidavits, in marked contrast to her role when faced with competing affidavits filed in connection with a motion for summary judgment. See generally *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied sub nom. *Bailey* v. *Bellotti*, 459 U.S. 970 (1982), quoting from *Hub Assocs.* v. *Goode*, 357 Mass. 449, 451 (1970) ("In considering a motion for summary judgment, the court does not 'pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts' "); *McGuinness* v. *Cotter*, 412 Mass. 617, 628 (1992) ("a judge may not consider the credibility of a witness or the weight of the evidence in ruling on a motion for summary judgment"). With those principles in mind, we turn to the substantive claims.

B. *Application of law to the plaintiffs' claims.* (1) *Filing the consumer class actions.* The role Stern played in filing the consumer class actions is the paradigm of petitioning activity. See, e.g., *Wenger, supra* at 5-6. There is no claim that those actions were without support in fact or law. Were filing the class actions the only conduct on which the complaint in this action focused, then it is clear that the case could not proceed.

(2) *Dissemination of "confidential information."* Filing the actions, however, is not the only conduct on which the complaint focuses. It also focuses on improper disclosure of confidential material, specifically, photographs and other information posted on bottledwaterfraud.com and included in the class action complaints that Stern, Sobol, and Ivey filed. The Web site was launched when the complaints were filed, and provided visitors with photographs purporting to show locations where water was obtained, information about the suits, information about the attorneys, and a mechanism for allowing those who wished to participate in the suits to provide the attorneys with contact information.

The plaintiffs claim that the material was created by Schlichtmann and had been designated as "common interest materials" in the joint litigation and confidentiality agreement (agreement). In the agreement, "common interest materials" were broadly defined as:

"documents, factual material, mental impressions, memo-

randa, interview reports, litigation strategies and other information, including the confidences of each client . . . (but only to the extent that such material and/or information was not already in the possession of the recipient before the communication of such material and/or information by a signatory to this Agreement or was thereafter independently obtained).''

The agreement restricted the way that "common interest materials'' could be used or disclosed.[11] Schlichtmann and Ehrlich

[11]The restrictions were contained in the following pertinent provisions of the agreement:

"6. Except as expressly stated in writing to the contrary, any and all Common Interest Materials obtained by any of the undersigned counsel from each other and/or each other's client[s] are being provided solely for internal use of the clients and their counsel and shall remain confidential and shall be protected from disclosure to any third party by the joint-defense privilege, the clients' attorney-client privilege, the attorneys' work product doctrine and other applicable privileges and immunities. All Common Interest Materials shall be used solely in connection with the Matter [which was not further defined in the Agreement].

"7. Neither the undersigned counsel nor their respective clients shall disclose Common Interest Materials or the contents thereof to anyone not a signatory to this Agreement (except the undersigned counsel's firms, or undersigned counsel's employees or agents) without first obtaining the written consent of all counsel who are parties to this Agreement. . . .

"8. All persons permitted access to Common Interest Materials shall be advised that such materials are privileged and subject to the terms of this Agreement.

". . .

"10. Any Claimant may withdraw from the potential and/or actual litigation at any time at their sole discretion; provided, however, that in the event of any Claimant's withdrawal, such Claimant shall expressly agree that the work product of this litigation that has been accumulated for the joint and several benefit of all Claimants shall remain the sole property of Counsel and shall not be used to the detriment of the remaining Claimants.

"11. Nothing in this Agreement shall obligate any signatory to share or communicate any Common Interest Materials or independently obtained or created materials with any other signatory hereto.

". . .

"13. [Any client who withdraws from this Agreement] shall promptly

claim that inclusion of those materials on the Web site and in the class action complaints violated those restrictions.

At the moment, Stern does not challenge Schlichtmann's and Ehrlich's contention that "common interest materials" appeared on the Web site and in the complaints filed, and we, therefore, proceed on the assumption that they did. Inclusion of those materials in the class action complaints was petitioning activity, so, as to that use of the materials, the question becomes whether Stern's decision to use them notwithstanding the agreement was devoid of any arguable basis in law and caused damage to Schlichtmann, to Ehrlich, or to both. Those are not easy questions to answer.[12]

Answers, however, are unnecessary because we think that use of the materials on the Web site was not petitioning activity. Indeed, we think that the Web site was virtually indistinguishable from the Web site at issue in *Cadle Co.*, 448 Mass. at 250, where the court said that the site had been "designed by [the defendant] to disseminate to the public information about Cadle and, by doing so, to attract clients to his law practice." In making that judgment, the court rejected the defendant's contention that he had

return all Common Interest Materials and shall continue to be bound by the obligations of confidentiality with respect to Common Interest Materials previously furnished pursuant to this Agreement."

[12]Throughout the complaint, Schlichtmann and Ehrlich deal with the relationship between Ehrlich and Stern, Sobol, and Ivey as if that relationship were the customary attorney-client relationship in which the client had the power to determine the extent of the attorney's authority and direct his actions. But insofar as the attorneys represented Ehrlich, they did so in her capacity as a potential class representative. Under those circumstances, it is far from clear that the normal attorney-client rules applied even though no action had been filed and no class had been certified. See generally, e.g., *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1110 (5th Cir. 1978), aff'd sub nom. *Deposit Guar. Natl. Bank v. Roper*, 445 U.S. 326 (1980) (even before certification of class, representatives have responsibilities to class and a "cease-fire may not be pressed upon them by paying their claims"); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (when a conflict arises between named plaintiffs and class, class attorney cannot allow interests of named plaintiffs to subvert those of class); *In re M & F Worldwide Corp.*, 799 A.2d 1164, 1174 (Del. Ch. 2002) (before a class is certified, counsel and the putative class representative have fiduciary obligations to the class and the attorneys do not represent the class representatives alone). The extent to which an attorney for the class can agree to limitations on use, for the benefit of the class, of information he acquires in connection with his class representation is, thus, far from clear.

created the site "to inform others of what he alleged were the un-
lawful collection activities of Cadle" and that it was not designed
to attract clients. *Id.* at 251. The court's rejection was based on
the defendant's inability to dispute "that he represents parties
adverse to Cadle in litigation and that his Web site, in unambigu-
ous terms, appeals to other potential clients to contact him." *Ibid.*

The court's characterization of the Web site at issue in *Cadle
Co.* is equally applicable to the site here. The very first page of
the site says, among other things, "If you have information on
bottled water that you suspect is not living up to its claims, *tell
us about it,*" a clear invitation to furnish information to Sobol
and Ivey about companies other than Nestle.[13] The same page
also has links that allow viewers to "sign up" and to "voice
[their] concerns," clear invitations to bring business to Sobol and
Ivey.

The Web page entitled "The Litigation Team" references the
law firms of which both Sobol and Ivey were members. The
name of Sobol's firm is hyperlinked and an invitation to "[e]mail
Ivey & Ragsdale," with the firm name hyperlinked, appears at
the bottom of the page. The page entitled "Sign Up" contains
spaces for viewers to send contact information to Sobol and Ivey
and says, among other things, "If you feel you may qualify for
damages or remedies that might be awarded in the Nestle lawsuit,
we request you fill out the form below to help us determine if
you are a legitimate member of the class or to make sure you get
any court mailings about the case." In addition, the page provides
a telephone number for those who do not wish to supply personal
information via an electronic mail (e-mail) message.

In the last analysis, the Web site was not simply an "interac-
tive public forum on issues relating to" the Nestle lawsuits.
Contrast *MacDonald* v. *Paton,* 57 Mass. App. Ct. 290, 294
(2003). Instead, and as in *Cadle Co.*, "it is the palpable com-
mercial motivation behind the creation of the Web site that so
definitively undercuts the petitioning character of the statements
contained therein." *Cadle Co., supra* at 252.[14]

---

[13]The words "tell us about it" were hyperlinked. Though the record does
not reflect the hyperlink's destination, no great exercise of imagination is
required to determine what the destination likely was. Nevertheless, we make
no judgment in that regard.

[14]It is true that the motion judge in *Cadle Co.* "determined, as a factual

Stern's response to the plaintiffs' claim about use of the confidential information on the Web site is, essentially, two-fold. First, he asserts that the only allegation about Stern the complaint contains is an allegation that he joined with Sobol and Ivey "on several class action Complaints as the attorney of record." Second, but related, is his claim that the damage about which the plaintiffs complain was caused by the consumer class actions that were filed and not by the contents of the Web site.

To be sure, the Web site does not mention Stern. Read with the requisite indulgence, however, see *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008), the complaint alleges that Stern, Sobol, and Ivey acted in concert to, among other things, "provide the clients' confidential information to [Sobol's] public relations firm for dissemination on the internet and to the news media." At this stage, that allegation is enough to tie Stern to use of the materials for a nonpetitioning purpose.

Stern's claim regarding lack of causation, while relevant at trial or even at summary judgment, is irrelevant at this point. At discussed earlier, § 59H requires a plaintiff to show a causal connection between activity and damage only after a defendant has shown that the activity in question was "petitioning activity." Insofar as the Web site is concerned, Stern has not made that showing.

(3) *Undermining the mediation for personal gain.* Finally, the complaint alleges that Stern undermined the mediation so he could proceed with separate litigation more beneficial to him personally. Stern forcefully contests that allegation, but the contest cannot stop the litigation's progress. Clearly, an allegation that an attorney sabotaged litigation that was beneficial to others in order to reformat and restart that litigation in a manner more beneficial to himself is not an allegation that implicates protected petitioning activity. See generally, e.g., *Goldman* v. *Kane*, 3 Mass. App. Ct. 336, 340-341 (1975); *Cavicchi* v. *Koski*, 67 Mass. App. Ct. 654, 657-659 (2006).

matter, that [the defendant] had set up the Web site for commercial reasons, as an informational center that would 'direct[ ] people to his own legal practice to attract business,' " *Cadle Co.*, *supra* at 250, and that here no such factual findings were made. In our view, findings of that type are unnecessary, for, on this record, the content of the material posted on the Web site speaks volumes about its purpose.

In sum, although the complaint does include allegations about "petitioning activity" as defined in G. L. c. 231, § 59H, each count also includes allegations about activity falling outside that term's generous definition. Accordingly, the anti-SLAPP motion was correctly denied.

*Judgment affirmed.*