CHRISTOPHER H. BARTLE & others[1] *vs.* KEVIN BERRY
& others.[2]

No. 10-P-1235.

Suffolk. April 7, 2011. - September 14, 2011.

Present: MEADE, SMITH, & FECTEAU, JJ.

*Attorney at Law,* Contingent fee agreement, Class action, Duty to Nonclient. *Contract,* Interference with contractual relations, Contingent fee agreement, Performance and breach. *Unlawful Interference. Conspiracy. Rules of Professional Conduct. Practice, Civil,* Class action, Attorney's fees, Vacation of judgment, Summary judgment.

Discussion of public policy concerns and principles related to litigation between cocounsel over the loss of prospective fees. [377-379]

In civil actions brought by certain attorneys and their law firms (plaintiffs) against other attorneys and their law firms (defendants), alleging that the defendants' actions in a class action suit in which the parties were involved deprived the plaintiffs of their fees and other benefits, a judge properly granted summary judgment in favor of the defendants, where, with regard to the plaintiffs' claim of interference with their advantageous business relations, neither the filing of a class action, nor any violation of disciplinary rules on the defendants' part in the underlying action, nor any breach by one defendant of his duty to a client in the underlying class action, nor the defendants' disclosure of common interest materials, in violation of a joint litigation agreement, constituted the type of independent legal wrong necessary to establish a claim of tortious interference between attorneys [380-383]; where, with regard to the plaintiffs' claim of civil conspiracy, public policy protected the defendants in their filing of separate class action suits in the underlying action [383-384]; and where, with regard to claims of breach of contract, the record showed that one individual defendant did not sign the relevant agreements, and there was no evidence to support the claim that other defendants' disclosure of common interest materials caused the plaintiffs' loss, rather than the filing of the class actions [384-385].

In a civil action brought by a plaintiff, who was a class representative in an underlying action, against certain attorneys and their law firms (defendants)

---

[1]Lori Ehrlich; Jan R. Schlichtmann; and Jan R. Schlichtmann, Attorney at Law, PC.

[2]Cozen O'Connor (a professional corporation); Thomas Sobol; Steve Berman; Hagens Berman Sobol Shapiro, LLP; Garve W. Ivey, Jr.; Barry Ragsdale; and Ivey & Ragsdale (a partnership).

who for a time represented the class in the underlying action, the judge properly granted summary judgment in favor of the defendants, where the defendants did not owe the plaintiff a duty of loyalty at the time they filed separate class actions, in that under the relevant representation agreement, the defendants' duty was to the class as a whole when they filed the class actions. [385-387]

In civil actions brought by certain attorneys and their law firms, as well as a client (plaintiffs), against other attorneys and their law firms (defendants), alleging that the defendants' actions in a class action suit in which the parties were involved deprived the plaintiffs of their fees and other benefits, a judge properly denied the plaintiffs' motion to vacate the judgments, where, even assuming that a particular finding by the judge regarding related cases constituted grounds for relief in the instant case, the plaintiffs failed to show that the finding required a different result in the related cases. [387-388]

In a civil action, a judge did not err in granting a late motion for summary judgment in favor of certain defendants, where the judge acknowledged that she had the authority to reconsider issues involved in earlier summary judgment proceedings, and where the defendants' failure to serve with their motion a statement of material fact did not require the judge to construe the plaintiffs' factual assertions as uncontested, in that the judge permitted those defendants to adopt by reference prior summary judgment materials submitted by other defendants in support of their earlier motions. [388-389]

CIVIL ACTIONS commenced in the Superior Court Department on September 19, 2003; April 3, 2006; May 1, 2006; and May 3, 2006, respectively.

After consolidation, motions for partial summary judgment were heard by *Ralph D. Gants*, J.; a motion for partial summary judgment was heard by *Margaret R. Hinkle*, J.; the remainder of the case was also heard by her; and a motion for relief from judgment was considered by her.

*Dana Alan Curhan* (*John R. Shek* with him) for Christopher H. Bartle.

*Jan R. Schlichtmann* for Jan R. Schlichtmann, Attorney at Law, PC, & others.

*Steven W. Kasten* for Kevin Berry & another.

*Michael E. Mone* for Hagens Berman Sobol Shapiro, LLP, & others.

SMITH, J. The plaintiffs, two attorneys (and one of their law firms) and a former class representative, filed multiple complaints in the Superior Court following the withdrawal of a potential class action settlement with Nestle Waters North America, Inc. (Nestle). The defendants are several attorneys

(and their respective law firms; collectively, defendant attorneys) who filed a separate class action against Nestle, thereby eliminating the plaintiffs' opportunity to settle with Nestle, and thus depriving the plaintiffs of fees and other benefits they would have received. On the defendant attorneys' motions for summary judgment, two judges ruled that the duty of undivided loyalty owed by the defendant attorneys to their clients in pursuing class action claims against Nestle trumped any potentially conflicting duty that the defendant attorneys might have owed to the plaintiffs. The plaintiffs now appeal. We affirm.

*Facts.* Much of the relevant background is set out in *Ehrlich* v. *Stern*, 74 Mass. App. Ct. 531, 532-535 (2009) (affirming denial of defendants' special motions to dismiss pursuant to G. L. c. 231, § 59H). We provide additional undisputed facts bearing on the issues on appeal, taken from the first judge's December 26, 2008, "consolidated memorandum of decision and order on motions for summary judgment."

The plaintiff attorneys are Christopher H. Bartle and Jan R. Schlichtmann. Defendants Thomas Sobol, Garve W. Ivey, Jr., and their respective law firms were originally Schlichtmann's cocounsel in representing the class. The litigation against Nestle had its origin in 2002, when Schlichtmann, Sobol, and Ivey (collectively, lead counsel) approached a number of bottled water companies (collectively, the competitors) with information that Nestle had misrepresented the source and quality of its Poland Springs brand of bottled water. Four of the competitors[3] hired lead counsel and their respective law firms to pursue a lawsuit against Nestle for the alleged misrepresentations. The competitors and lead counsel entered into contingent fee agreements, whereby lead counsel were to receive a contingent fee in the event the case settled or a judgment was issued in the competitors' favor. An additional defendant, Kevin Berry, an attorney for Vermont Pure Holdings, Ltd. (Vermont Pure), also joined in the representation, as did Bartle, an attorney who served as the chief executive officer of Tear of the Clouds, LLC.[4]

---

[3]Glenwood Farms, Inc.; Carrabassett Spring Water Company; Tear of the Clouds, LLC; and Vermont Pure Holdings, Ltd.

[4]The contingent fee agreement with Vermont Pure was contained in its

Lead counsel also decided to bring a class action against Nestle on behalf of consumers who had been adversely affected by the representations, and plaintiff Lori Ehrlich, an acquaintance of Schlichtmann, agreed to serve as a class representative. Potential conflicts of interest were addressed in a joint litigation agreement signed by Ehrlich, the competitors, and lead counsel. For relevant provisions, see *id.* at 538-539 & n.11.[5] The competitors also executed attorney representation agreements containing the contingency fee terms and addressing potential conflicts of interest between lead counsel's representation of the competitors and the putative class.

Lead counsel notified Nestle of the claims, and settlement discussions ensued. As of May 29, 2003, Nestle indicated that it would pay no more than $20 million to resolve all claims against it. Sobol and Ivey concluded that Nestle's settlement offer was insufficient and wanted to proceed to litigation. Schlichtmann and Ehrlich disagreed and continued to negotiate with Nestle. As a result of the disagreement, Ehrlich terminated Sobol and Ivey as her attorneys on May 30, 2003. On the evening of June 4, 2003, Schlichtmann reported on behalf of the competitors and the consumer class that he and Nestle had reached a proposed settlement.[6] Schlichtmann and Ehrlich wanted to accept the offer, while Sobol and Ivey were strongly opposed. On June 10, 2003, Sobol and Ivey, having been fired by Ehrlich, were retained by Deborah Kuhn and Lisa McGonagle to represent them individually and as class representatives in litigation against Nestle.

On June 16, 2003, Nestle reported that it had accepted the terms of the settlement offer made on June 4. This apparently surprised Berry, who already had presented the June 4 offer as a

attorney representation agreement, and specifically provided that the attorneys' share of any settlement or judgment would be split three ways, with the lead counsel group to receive 26.66 percent, Berry to receive 10 percent, and Bartle, 3.33 percent.

[5]Briefly, the joint litigation agreement's confidentiality provisions prohibited disclosure to third parties of common interest materials that were shared among the attorneys and the clients.

[6]The settlement called for, inter alia, payment of substantial sums of money to the competitors. For the class, there was to be payment of $500,000 to an environmental cause of Ehrlich's choosing each year for five years.

firm deal to Vermont Pure's board of directors. In an electronic mail (e-mail) message terminating Schlichtmann's representation of Vermont Pure, Berry claimed that Schlichtmann had misrepresented the offer as already having been agreed to by Nestle. Berry further indicated that Vermont Pure would proceed to litigation if it deemed it appropriate.

On June 18, 2003, Berry informed Sobol and Ivey that Vermont Pure had no objection to their filing of class actions against Nestle. While there was no dispute that Berry was authorized to do so, it was disputed whether Berry fully informed Vermont Pure of the potential impact of litigation on the settlement negotiations. Later the same day, Sobol and Ivey filed class actions against Nestle in a number of jurisdictions, with Kuhn and Mc-Gonagle as class representatives. Sobol and Ivey also disseminated information regarding the class claims against Nestle on a Web site and through other media. As a result, Nestle withdrew the settlement offer it had negotiated with Schlichtmann, causing Schlichtmann to lose millions of dollars in contemplated legal fees and Ehrlich to lose her anticipated right to direct monies to her favorite environmental causes.

Bartle and Schlichtmann each filed a complaint in Superior Court against the defendant attorneys for the attorney's fees Bartle and Schlichtmann would have received under the contingent fee agreements had the settlement with Nestle gone forward. Both alleged tortious interference with economic relations, civil conspiracy, breach of contract, and breach of the implied covenant of good faith and fair dealing, stemming from the defendant attorneys' filing of the class actions and the lost settlement opportunity. Schlichtmann raised additional claims for negligence and breach of fiduciary duty. Ehrlich joined in Schlichtmann's suit, her claims mirroring Schlichtmann's, but alleging as damages the benefits she would have derived from the settlement. Two related actions were filed, one by Vermont Pure against Sobol and Berry (and their respective law firms), and a second by Sobol and Ivey (and their respective law firms) against Glenwood Farms, Inc.; Carrabassett Spring Water Company; and Schlichtmann. The four suits were consolidated for purposes of pretrial proceedings.

In a decision dated December 26, 2008, the first judge decided eight motions for summary judgment in the consolidated cases.

The judge granted summary judgment in favor of the defendant attorneys on the claims brought against them by Bartle, Schlichtmann, and Ehrlich, and denied summary judgment as to the claims brought by Vermont Pure. The judge essentially ruled, as a matter of public policy, that the defendant attorneys' duty to their clients, on whose behalf they filed the class actions, was superior to any obligations they might owe to the other attorneys involved in the case against Nestle. For that reason, the judge ruled that Bartle and Schlichtmann had failed to demonstrate that by commencing the class actions against Nestle, the defendant attorneys caused Bartle and Schlichtmann to lose the opportunity to settle with Nestle first, and thereby recover attorney's fees under the contingent fee agreements. For Ehrlich's part, the judge ruled that the defendant attorneys' primary duty was to the consumer class, and not to her as a former class representative. Thereafter, a second judge granted Ivey, Barry Ragsdale, and their law firm leave to file a motion for summary judgment late, and granted summary judgment in their favor on the same grounds as those stated by the first judge.

A hearing later was held on Vermont Pure's professional misconduct and breach of conduct claims against the defendant attorneys, and the second judge found that Nestle's June 4, 2003, settlement offer would have been approved by a reasonable judge. On the basis of that finding, Schlichtmann and Ehrlich moved under Mass.R.Civ.P. 60(b)(6), 365 Mass. 828 (1974), to vacate the dismissal of their claims. Their motion was denied by the second judge. This appeal followed.

*Discussion.* "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The nonmoving party's failure to prove an essential element of his case "renders all other facts immaterial" and mandates summary judgment in favor of the moving party. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991), citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986).

1. *Bartle's and Schlichtmann's appeals.* A principal issue on

appeal is whether the judges correctly relied on principles of public policy in reaching their decisions. There is no question that an attorney owes a duty of undivided loyalty to his client. See *Pollock* v. *Marshall*, 391 Mass. 543, 555 (1984); *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 408-409 (2003). In the absence of an attorney-client relationship, an attorney has a duty of reasonable care to a nonclient if the attorney knows or has reason to know the nonclient is relying on the attorney's services. *Lamare* v. *Basbanes*, 418 Mass. 274, 276 (1994). "However, the court will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her client." *Ibid.* For this principle to apply, it is unnecessary that the nonclient in question be in an adversarial role to the attorney's client, only that the potential for a conflict exists. *Id.* at 277.

Also relevant to our discussion is the absolute litigation privilege recognized by our courts. Based on similar policy grounds, it shields an attorney from civil liability to nonclients for statements made in the course of litigation. *Sriberg* v. *Raymond*, 370 Mass. 105, 109 (1976). An attorney's statements are privileged "where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Ibid.* The privilege applies not only to defamation claims brought against the attorney, but to civil liability generally. *Ibid.* See *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593-594 (1982) (action for malicious prosecution could not be brought against attorney who commenced lawsuit with client's authority and in good faith as to its grounds). The privilege "is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Sullivan* v. *Birmingham*, 11 Mass. App. Ct. 359, 361 (1981), quoting from Restatement (Second) of Torts § 586 comment a (1977).

Nevertheless, an attorney is not completely immune from liability to nonclients. *Spinner* v. *Nutt*, 417 Mass. 549, 552 (1994). For example, in *Beecy* v. *Pucciarelli, supra* at 592-594, the court suggested that an attorney who filed litigation without the client's permission or who knowingly agreed to bring a ground-

less suit was not protected by the litigation privilege. See *Kurker v. Hill*, 44 Mass. App. Ct. 184, 192 (1998) (litigation privilege protects attorney in conduct of litigation but not for counsel and assistance in business matters generally). The court likewise has stated, however, that " 'where an attorney is also under an independent and potentially conflicting duty to a client,' we are less likely to impose a duty to nonclients." *Spinner* v. *Nutt, supra*, quoting from *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 524, cert. denied, 493 U.S. 894 (1989).

In an effort to address these policy concerns, courts in some jurisdictions have adopted a bright-line rule prohibiting lawsuits between cocounsel over the loss of prospective fees. See, e.g., *Beck* v. *Wecht*, 28 Cal. 4th 289, 297-298 (2002) (public policy protecting attorney's undivided loyalty to client prohibited counsel from suing each other over prospective interests in contingent fee arrangement); *Scheffler* v. *Adams & Reese, LLP*, 950 So. 2d 641, 653 (La. 2007) (undivided loyalty to client should not be diluted by duty to protect cocounsel's interest in prospective fees); *Mazon* v. *Krafchick*, 158 Wash. 2d 440, 449 (2006) (undivided duty of loyalty to pursue case in client's best interest means that no duty exists between cocounsel that would allow recovery for lost or reduced prospective fees); *Horn* v. *Wooster*, 165 P.3d 69, 78-79 (Wyo. 2007) (refusal to recognize cause of action by one attorney against his negligent cocounsel for lost or reduced prospective fees, as duty of undivided loyalty to client could be compromised). Those courts flatly rejected any imposition of a duty of care owed by one attorney to another to protect an attorney's prospective interest in contingency fees.

Given the state of the law, Bartle and Schlichtmann do not raise any claims based on a direct duty of care between cocounsel.[7] Rather, they seek recovery of their lost fees through claims for interference with advantageous business relations, civil conspiracy, and breach of contract, or what the first judge here characterized as their attempt to "end-run" the inherent conflicts posed by their claims.

With these principles in mind, we turn to the specific arguments raised by Bartle and Schlichtmann on appeal.

---

[7]Schlichtmann makes no specific argument regarding the dismissal of his claim for breach of fiduciary duty.

a. *Interference with advantageous business relations.* In short, Bartle and Schlichtmann claim that by interfering with Nestle's June 4, 2003, settlement offer, the defendant attorneys caused Bartle and Schlichtmann to lose their anticipated attorney's fees under the various contingent fee agreements.

To establish a claim for interference with advantageous business relations, a plaintiff is required to prove that "(1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Cavicchi* v. *Koski,* 67 Mass. App. Ct. 654, 657 (2006), quoting from *Kurker,* 44 Mass. App. Ct. at 191.[8] To demonstrate improper means, a plaintiff must prove improper conduct beyond the fact of the interference itself. See *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 816-817 (1990); *Cavicchi, supra.*

As concerns the specific claim of tortious interference against other attorneys for rights to prospective fees under a contingent fee agreement, Massachusetts courts have recognized that special policy considerations are implicated. In particular, this court has identified a strong public policy in protecting a client's right to seek advice and change counsel without subjecting new counsel to liability for tortious interference by former counsel. See *Cavicchi, supra* at 661, citing *Malonis* v. *Harrington,* 442 Mass. 692, 696, 697 n.6 (2004). See generally *KACT, Inc.* v. *Rubin,* 62 Mass. App. Ct. 689, 699-700 (2004), citing Restatement (Second) of Torts § 767 (1979) (relationship of parties, and "the social interests in protecting the freedom of action of the actor," may be considered in determining whether conduct amounted to improper means). For that reason, when an attorney-client relationship is at stake, an attorney's claim against another attorney for interference with advantageous business relations requires proof that the interference was

---

[8]Bartle also alleged interference with contractual relations, which required proof that he had a contract with a third party, that the defendant knowingly induced the third party to break the contract, that the defendant's interference was improper in motive or means, and that he was harmed by the defendant's actions. See *Cavicchi, supra.*

accomplished by improper means; improper motive, alone, is not actionable. *Walsh* v. *O'Neill*, 350 Mass. 586, 589-590 & n.1 (1966) (attorney's interference claim founded on improper motive of successor counsel was precluded on policy grounds).[9] See *Cavicchi, supra* at 658-659. Thus, in this case, Bartle and Schlichtmann must show that the defendant attorneys used improper means to cause Nestle to withdraw its settlement offer. Improper means may be shown by proof of a violation of a statute or common-law precept. *Id.* at 658.

We agree with the first judge that the defendant attorneys' filing of class action suits did not satisfy this element of the claim. Initiating the lawsuits on behalf of the consumer class, regardless of motive, violated no duty to the plaintiffs, under the principles of *Lamare*, 418 Mass. at 276, as well as under the litigation privilege, and so did not constitute the improper means necessary to prove the plaintiffs' interference claims. Contrast *Cavicchi, supra* at 658-660 (attorney's defamatory statements about client's previous counsel constituted improper means to support claim for interference with advantageous business relations).

Bartle disputes that he is required to prove improper means strictly by proof of a common-law tort or violation of a statute.[10] Rather, in his view, the defendant attorneys' violation of the disciplinary rules should be treated as the equivalent of a violation of a common-law precept or statute, thus satisfying the element of interference by improper means. In particular, Bartle claims that the defendant attorneys breached the disciplinary rules addressing their obligations to their clients.[11] We are not persuaded.

[9]This contrasts with cases involving ordinary business relations, whereby the interference may be proven by improper motive *or* improper means. *Cavicchi, supra* at 658. See, e.g., *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 816.

[10]Bartle also disputes, as a general matter, that public policy shielded the defendant attorneys from liability to him when they commenced litigation on behalf of their clients, but he fails to develop the argument or persuade us with relevant authority on that point.

[11]Bartle supports his claim with an expert affidavit, explaining that the conduct of the defendant attorneys violated an attorney's duty of loyalty to his client, see Mass.R.Prof.C. 1.3, 426 Mass. 1313 (1998), and the conflict of interest rules, see Mass.R.Prof.C. 1.7, as amended, 430 Mass. 1301 (1999), and Mass.R.Prof.C. 1.9, 426 Mass. 1342 (1998).

We note, first of all, that even the violation of a statute or common-law rule does not necessarily constitute improper means. See *KACT, Inc.*, 62 Mass. App. Ct. at 699 ("even where there is a violation of statute or common law rule, there must be a case-by-case evaluation"). We consider, rather, the purpose of the statute or common-law rule in the context of the relationship of the parties, and whether the alleged violation constituted improper conduct as to the particular plaintiffs. *Ibid.* For example, in *KACT, Inc.*, this court held that the trustees of a condominium trust had not interfered by improper means with the plaintiffs' potential sale when the trustees acted in the best interest of the other unit owners, even though trustees' conduct may have exceeded their statutory authority under G. L. c. 183A. *Id.* at 699-700. "Given the relationship of the parties on this issue, any violation of the statute, or of the provisions of the condominium documents, at least as to the plaintiffs, did not amount to improper means." *Id.* at 700. By the same token, the defendant attorneys here were acting on behalf of their clients, the consumer class, when they filed the class actions.

Moreover, in *Walsh*, 350 Mass. at 590 n.1, the court observed that, for public policy reasons, in the context of an attorney-client relationship and the duty implicated thereby, the improper means alleged by one attorney against another must be "unlawful" to be actionable. "In such cases, it would seem that the cause of action is founded in that conduct and that the hurt from loss of the business relationship is a matter of damages flowing from the well recognized legal wrong." *Ibid.* It is well established that a violation of the disciplinary rules does not provide an independent basis for liability against an attorney. See *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 141 (1996); *Bratcher* v. *Moriarty, Donoghue & Leja, P.C.*, 54 Mass. App. Ct. 111, 115 n.8 (2002). We therefore decline to ate a violation of the disciplinary rules with the type of independent legal wrong necessary to establish a claim of tortious interference between attorneys.

Schlichtmann, for his part, argues that the defendant attorneys mployed improper means that went beyond commencing the class actions, namely, their publishing of common interest materials on their Web site and communicating with other media, in

violation of the joint litigation agreement. He further maintains that the use of those materials, which he claims constituted a breach of the duty owed to cocounsel under the agreement, also constituted improper means sufficient to satisfy the requirement of the violation of a common-law precept. The first judge rejected the argument, noting, among other things, that it was the filing of the consumer class actions, and not the defendant attorneys' disclosure of common interest materials on the Internet and in other media, that caused Nestle to withdraw the settlement offer. Schlichtmann responds that the first judge ignored disputed facts on this point but offers no support for his claim, as is his burden in opposing summary judgment. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. at 716; *Lawrence* v. *Concord*, 439 Mass. 416, 417 n.2 (2003). In the absence of proof, the summary judgment record supports the first judge's conclusion that it was the filing of the class actions that prompted Nestle to withdraw the settlement offer.[12]

Bartle and Schlichtmann further claim that Berry improperly authorized Sobol and Ivey to file the class actions on behalf of Vermont Pure. On this point, we concur with the first judge that Berry's duty of loyalty was to Vermont Pure rather than to the plaintiffs. We also conclude that Berry's authorization of the class action filings was protected by the litigation privilege, which serves as a defense to claims of interference with advantageous business relations brought by nonclients, based on statements made preliminary to litigation. See *Visnick* v. *Caulfield*, 73 Mass. App. Ct. 809, 812-813 (2009). See also *Blanchette* v. *Cataldo*, 734 F.2d 869, 877 (1st Cir. 1984), citing *Sriberg* v. *Raymond*, 414 F. Supp. 396, 398 (D. Mass.), aff'd, 544 F.2d 15 (1st Cir. 1976). To the extent Berry's authorization constituted improper conduct toward his own client, the plaintiffs fail to convince us that a breach of Berry's duty to Vermont Pure provided the independent tort to support the plaintiffs' tortious interference claims. See, e.g., *Walsh*, 350 Mass. at 590 n.1.

b. *Civil conspiracy.* To prove their claims for civil conspiracy, the plaintiffs must show an underlying tortious act in which two

---

[12]Schlichtmann himself emphasized at his deposition that it was clear to everyone involved that the filing of litigation would cause Nestle to stop negotiating.

or more persons acted in concert and in furtherance of a common design or agreement. *Kurker*, 44 Mass. App. Ct. at 188-189. For the requisite underlying tortious act, the plaintiffs rely on the same allegations underpinning their claim of tortious interference. We already have concluded, however, that public policy protected the defendant attorneys in their filing of class action suits on behalf of their clients. Accordingly, the plaintiffs' claims that the defendant attorneys conspired against them necessarily fails.

The same holds true with regard to Schlichtmann's argument that Sobol and Ivey conspired with Berry to deceive and manipulate Vermont Pure into authorizing the filing of the class actions and firing Schlichtmann. Sobol's and Ivey's alleged role in these actions was subject to the protections outlined in *Lamare*, *Walsh*, and *Cavicchi*, as discussed, *supra*. In sum, Schlichtmann points to no authority supporting his contention that the defendant attorneys' alleged misconduct formed the underlying tortious conduct required to establish a conspiracy claim brought by a nonclient.

c. *Breach of contract.* As to Bartle's breach of contract claim against Berry, the record confirms the first judge's conclusion that the claim fails because Berry did not sign the relevant agreements.[13] We are also unpersuaded by Bartle's argument that Berry should be bound by contracts to which he was not a party simply because he acted as if he were bound. No genuine issue of material fact exists on that issue because Bartle points to no evidence of reasonable reliance supporting his contention that Berry was estopped from denying his obligations under the relevant contracts. See, e.g., *Rhode Island Hosp. Trust Natl. Bank* v. *Varadian*, 419 Mass. 841, 850 (1995) (any reliance by people experienced in business on bank's oral statement regarding loan was unreasonable as matter of law).[14]

Schlichtmann's breach of contract claim is based on Sobol's

[13]Bartle points to a letter dated May 7, 2003, signed by Berry, consenting to Bartle's representation of Vermont Pure and confirming Berry's fee-sharing arrangement with Bartle with respect to Vermont Pure's share of potential funds recovered from Nestle. The letter sets out no further obligations undertaken on Berry's part.

[14]Citing *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991), Bartle additionally argues that the first judge erred in dismissing his claim for breach of the implied covenant of good faith and fair dealing on the

and Ivey's alleged disclosure of common interest materials on the Internet and in the other media, which, according to Schlichtmann, breached the confidentiality provisions of the joint litigation agreement. The claim likewise fails. As previously explained, Schlichtmann did not establish with specific facts that the defendant attorneys' alleged breach of the agreement, rather than the filing of the class actions, caused his loss.

2. *Ehrlich's appeal.* While the substance of Ehrlich's claims largely mirrors those of Schlichtmann, rather than lost attorney's fees, she claims as damages the loss of the benefits of the settlement with Nestle that would have inured to her, had the defendant attorneys not filed suit against Nestle. She now appeals from the first judge's determination that she suffered no compensable damages. Because we concur with the judge's ruling that Ehrlich has no individual cause of action against the defendant attorneys, we do not reach her argument concerning damages.

Sobol and Ivey represented Ehrlich in her role as a putative class representative of the consumer class until she fired them on May 30, 2003. She accordingly bases her arguments on Sobol's and Ivey's duty owed to her as their former client. Ehrlich maintains that as a former client, she still was owed a duty of loyalty by Sobol and Ivey when they filed the class actions on June 18, 2003, which caused her to lose the benefits of Nestle's settlement offer.

We recognize that ordinarily, in accordance with the Rules of Professional Conduct, an attorney's duty of loyalty continues even after termination of the attorney-client relationship.[15] Nevertheless, under the attorney representation agreement

---

basis of an absence of proof that the underlying contracts were breached. In fact, the judge dismissed the claim principally because the covenant cannot be used to imply a duty that would circumvent the defendant attorneys' primary duty of loyalty to their clients. See, e.g., *Mazon* v. *Krafchick,* 158 Wash. 2d at 449 (potential for impermissible conflict of interest should cocounsel be permitted to characterize attorney's tactical decisions to settle or to proceed to trial as breach of contractual duties counsel owed to one another). In any event, the public policy considerations informing the disposition of this case were not present in *Anthony's Pier Four, Inc., supra* at 471-474.

[15]Rule 1.9(a) of the Rules of Professional Conduct, 426 Mass. 1342 (1998), prohibits an attorney who has formerly represented a client in a matter, absent consent, from representing another client in the same or a substantially related matter "in which that person's interests are materially adverse to the interests of the former client."

between Ehrlich and lead counsel, Sobol and Ivey had a duty of loyalty to the consumer class as a whole when they filed the class actions. At that point, they did not owe a conflicting duty to Ehrlich, individually.

Specifically, the attorney representation agreement signed by Ehrlich provides that Sobol and Ivey could represent other individuals and classes in the litigation, and that Sobol's and Ivey's primary duty was to the consumer class, rather than to Ehrlich, in the event she disagreed with their representation.[16] Thus, after Ehrlich terminated Sobol's and Ivey's representation on May 30, 2003, their duty of undivided loyalty, upon being retained by new class representatives, remained with the class as a whole. See *Ehrlich* v. *Stern*, 74 Mass. App. Ct. at 540 n.12. See generally *Parker* v. *Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) ("duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs"); *Maywalt* v. *Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (class counsel have obligation to all class members, whose interests should not be subordinated to those of class representatives); *In re M & F Worldwide Corp.*, 799 A.2d 1164, 1174-1175 (Del. Ch. 2002) (named plaintiffs gave up right to dictate outcome of class action, where "counsel owed a duty to act in good faith on behalf of all intended beneficiaries of the representative action, and not simply at the direction of the named plaintiffs").

---

[16]The attorney representation agreement between lead counsel and Ehrlich expressly limited Ehrlich's individual rights in that respect. It specifically provided that lead counsel undertook "the representation of all members of the plaintiff class" and "reserved the right to determine litigation tactics on behalf of all clients, and the class." The agreement also provided that "[client] understands that if a dispute arises between or among clients of the firm, [attorneys] cannot act on behalf of any single client or group of clients in connection with that dispute." The attorney representation agreement advised Ehrlich that lead counsel intended to represent other persons and classes of persons and that "[client] agrees that the joint representation of multiple interests contemplated by this agreement shall not prevent one or more of the [attorneys] from representing a separate interest in circumstances where a conflict of interest arises." Ehrlich expressly agreed that she was suing Nestle as a class representative, and that she had individual representation pursuant to a separate agreement. See generally *In re "Agent Orange" Prod. Liab. Litigation*, 818 F.2d 179, 187 (2d Cir. 1987) (plaintiff who joins class action gives up "right to control the litigation in return for the economies of scale available under" Federal rules applicable to class actions).

We also reject Ehrlich's claims against Berry, as she fails to account for the fact that Berry's client was Vermont Pure, not Ehrlich. The principles of *Lamare*, 418 Mass. at 276, prohibit the imposition of a duty between Berry and Ehrlich that potentially would conflict with Berry's paramount duty of undivided loyalty to Vermont Pure.[17]

3. *The rule 60(b)(6) motion.* Schlichtmann and Ehrlich further argue that the second judge abused her discretion in denying their motion to vacate the judgments pursuant to Mass.R.Civ.P. 60(b)(6), 365 Mass. 828 (1974). In support of their claim, they point to the judge's finding that Nestle's June 4, 2003, offer to settle the class claims was reasonable and would have been approved by a judge.[18] Schlichtmann and Ehrlich argue that this finding demonstrates that the defendant attorneys interfered with the settlement by improper means, that is, the rejection of a reasonable settlement offer, in order to file the class actions and increase their share of attorney's fees.

Assuming, without deciding, that the second judge's finding in the related case would constitute sufficient grounds for relief in this case under rule 60(b)(6), Schlichtmann and Ehrlich fail to show that the finding requires a different result in the summary judgment motions decided in this case. Under *Walsh, supra,* the defendant attorneys' alleged improper motive for rejecting the settlement offer was not material to the plaintiffs' claims of interference against an attorney. And, as previously discussed, Schlichtmann and Ehrlich provide no authority for the proposition that actions taken by the defendant attorneys on behalf of

[17]Ehrlich complains that her claims against the defendant attorneys were treated differently than Vermont Pure's claims, which survived the motions for summary judgment on what she wrongly characterizes as the same facts. First, the defendant attorneys represented Vermont Pure as an individual client, not as a class representative. The attorney representation agreement signed by Vermont Pure provided for distinct obligations for the individual representation of Vermont Pure as well as the other competitors. The obligations undertaken by the defendant attorneys towards Ehrlich, by contrast, reflected her limited role as a class representative. Moreover, Vermont Pure remained the defendant attorneys' client when the class actions were filed. Ehrlich had fired Sobol and Ivey by that time. Thus, their duty, at that point, was to the class.

[18]The finding is contained in a memorandum and order in an action for professional misconduct and breach of contract by Vermont Pure, against Berry and his law firm.

Vermont Pure, who was their individual client, even if a breach of their duty to Vermont Pure, can provide the improper means necessary to establish a claim for tortious interference brought by nonclients. There was no error.

4. *Late summary judgment motion by Ivey, Ragsdale, and their firm.* Schlichtmann and Ehrlich lastly argue that the second judge erred in granting summary judgment in favor of Ivey, Ragsdale, and their firm, as she wrongly concluded that she was bound by the first judge's December 26, 2008, summary judgment decision, and misapplied the law of the case doctrine. We disagree with this characterization of the second judge's decision. In fact, in deciding the late motion for summary judgment,[19] the judge expressly acknowledged that she was not bound by the earlier decision and that she had the authority to reconsider the issues involved in the earlier summary judgment proceedings. Nevertheless, the judge determined that Ivey's and Ragsdale's relationship to the plaintiffs was identical to Sobol's and Steve Berman's in all material respects, and that Schlichtmann and Ehrlich had not shown error in the December 26, 2008, rulings, nor shown any other reason that those rulings did not constitute the law of the case.

Schlichtmann and Ehrlich also argue that Ivey's and Ragsdale's failure to serve with their summary judgment motion a statement of material facts, pursuant to rule 9A(b)(5) of the Rules of the Superior Court, or to file an additional statement of material facts in response to the plaintiffs' rule 9A(b)(5) submission in response to the motion, required the second judge to construe the plaintiffs' factual assertions as uncontested and, on that basis, deny the motion for summary judgment. According to the record, however, the second judge, in addition to deciding the summary judgment motion, also granted Ivey's and Ragsdale's motion for leave to adopt by reference the summary judgment materials filed by Sobol, Berman, and Berry in support of their earlier motions. The second judge also rejected the plaintiffs' request to sanction Ivey and Ragsdale for their failure to submit a rule 9(b)(5) statement, noting that the function and purpose of the rule, to assist the judge and facilitate case management, had not been thwarted by the omission. See *Dziamba* v.

---

[19]The motion was filed three months after the summary judgment decision.

*Warner & Stackpole LLP*, 56 Mass. App. Ct. 397, 399-401 (2002). See also *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 46 n.18 (2005). Given these rulings, we see no reason to require the second judge to construe as uncontroverted the plaintiffs' statement of material facts due to Ivey's and Ragsdale's failure to comply with rule 9(b)(5). There was no error.

*Judgments affirmed.*

*Order denying rule 60(b)(6) motion affirmed.*